UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| PROGRESSIVE GAMING INTERNATIONAL CORPORATION Plaintiff | ) | |
| v. | ) | C.A. No. 08-013/S |
| GREG VENTURI and JOHN FERL, Defendants. | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S OBJECTION TO DEFENDANT JOHN FERL'S MOTION TO DISMISS OR TO TRANSFER**

Plaintiff Progressive Gaming International Corporation ("PGIC") submits this memorandum in support of its objection to defendant John Ferl's motion to dismiss or to transfer, filed on March 7, 2008.

**TABLE OF CONTENTS**


Introduction.....2

Facts.....3

Discussion.....7

I. This Court Has Specific Personal Jurisdiction Over Ferl.....7

A. Relatedness.....8
B. Purposeful Availment.....13
C. Reasonableness.....14

II. This Court is the Appropriate Venue in Which to Litigate the Claims Against Ferl.....17

III. Plaintiff Has Stated Claims Upon Which Relief Can be Granted.....18

A. Mikohn Has Stated a Proper Claim for Champerty.....19

1. Rhode Island Law Governs This Dispute.....19

2. Under Rhode Island Law, Ferl's Actions Were Champertous....20

B. Mikohn Has Stated a Proper Claim for Defamation....25

1. Statute of Limitations....25

2. Privilege....27

C. Mikohn Has Stated Proper Claims for Defamation, Civil Conspiracy, Unjust Enrichment and Tortious Interference with Contract and Business Relations....29

D. Ferl is Not Protected By a Release Between Mikohn and Hasbro....32

1. Ferl's Argument That he Was Released From Liability For His Tortious Acts is Not Proper in a Rule 12(b)(6) Motion....32

2. Neither Venturi Nor Ferl are Agents of Hasbro....32

IV. Ferl Improperly Relies on Evidence Outside the Pleadings....33

Conclusion....34

## INTRODUCTION

Ferl's motion is a virtual carbon copy of the one filed by his co-defendant, Greg J. Venturi, Esq., on February 28, 2008. Except for the frequent replacement of the name "Greg Venturi" with "John Ferl" and the inclusion or exclusion of a handful of sentences, the words, arguments, legal citations and declarations are indistinguishable.[1] Even the typographical and grammatical errors are identical.

---

[1] It is not clear whether Ferl has retained Venturi to represent him in this litigation. Ferl's motion to dismiss purports to be submitted *pro se*. However, it is apparent that Venturi drafted Ferl's motion. Compare Defendant Ferl's Motion to Dismiss with Defendant Venturi's Motion to Dismiss. Moreover, Ferl openly states in his declaration that he has been provided with legal advice in this litigation. Ferl Declaration at ¶4 ("**I am advised** that there is no cause of action for Champerty in California…. Rhode Island case law provides an absolute immunity for statements made during the pendency of litigation…."). To the extent that Venturi has advised Ferl or served as his "ghost writer" in this litigation, it should be noted that Venturi is neither a licensed Rhode Island attorney, nor has he been admitted *pro hac vice*.

By re-submitting Venturi's motion to support his case, Ferl (presumably inadvertently) makes multiple factual misrepresentations and, at one point, actually advocates for his own liability. For example, Ferl argues **he**, not Venturi, is the only proper defendant for Mikohn's champerty count: "Defendant Venturi's duties [under the Finder's Fee Agreement] are not 'champertous,' but merely to vouch for the likelihood that [Ferl] has information which is true.... [I]t is clear that [Venturi] is acting on behalf of [Ferl]." Ferl Motion at 8. At another point, in his declaration, Ferl states: "I am the (legal) agent for the undisclosed principal, but I have no duties to assist, nor did I, in fact assist in the litigation." Ferl Declaration at ¶5. This statement is plainly false; there is no question that Venturi was Ferl's agent. Venturi Declaration at ¶ 5; see also, Declaration of Robert Ziems, Tabs 1-9, filed under seal [Dkt. Entry 13, dated 3/21/08], identified hereafter as "Ziems Dec."

The factual inaccuracies and sometimes self-destructive arguments contained in Ferl's mirror motion to dismiss necessitate PGIC largely repeating its arguments in opposition to Venturi's motion.

## FACTS

PGIC is formerly known as Mikohn Gaming Corporation. Because many of the operative facts took place when the company's name was Mikohn Gaming Corporation, the corporation is referred to throughout this memorandum as "Mikohn" or "plaintiff." In its complaint, filed January 9, 2008, Mikohn alleged counts of champerty, tortious interference with contract, tortious interference with business relations, defamation, unjust enrichment and civil conspiracy against defendants John Ferl and Greg Venturi. On March 7, 2008, defendant Ferl moved to dismiss.

In 1998 Mikohn entered into a pair of Worldwide Licensing Agreements with Hasbro, Inc. and Hasbro International, Inc. (hereafter together referred to as "Hasbro"). Complaint ¶ 14. Pursuant to the licensing agreements, Mikohn agreed to pay royalties for the right to use Hasbro's Battleship and Yahtzee trademarks on slot machines. Id. at ¶¶ 14-17.

For nearly seven years Mikohn and Hasbro enjoyed a tranquil, amicable and mutually beneficial business relationship. Hasbro collected millions of dollars in royalties under the agreements. Indeed, the agreements were so successful that the two companies sought to license more of Hasbro's brands for slot machines – Clue and Trivial Pursuit. Through two audits and dozens of monthly royalty reports, Hasbro again and again concluded that Mikohn had properly calculated and paid royalties. Id. at ¶¶ 17-21.

Then, in early 2005, Hasbro sent a letter demanding more than $6 million in allegedly underpaid royalties under an interpretation of the agreement not previously relied upon by either Hasbro or Mikohn. Id. at ¶ 32. Two weeks later Hasbro sued Mikohn in this Court in a case captioned Hasbro, Inc. and Hasbro International, Inc. v. Mikohn Gaming Corp., C.A. 05-106 (hereafter "Hasbro/Mikohn litigation"). The resulting lawsuit initiated nearly three years of expensive litigation, generating two written decisions from this Court and occupying significant amounts of the Court's and the parties' time and resources.

During the Hasbro/Mikohn litigation, Mikohn sought to learn the basis of Hasbro's changed contract interpretation. Hasbro was evasive. Finally, in October 2005 - after this Court ordered it to do so - Hasbro disclosed communications it had with Venturi and Ferl. Complaint ¶ 34. Ferl had previously done some consulting work for Mikohn years earlier. Hasbro eventually produced documents demonstrating that Venturi contacted Hasbro in July 2004 on behalf of, at the direction of, and for the benefit of Ferl, claiming to represent an "undisclosed principal" who

had knowledge that Hasbro had been underpaid millions of dollars by one of its licensees "due to some rather dubious accounting practices." Id. at ¶ 23-24.

In its entirety, Venturi's July 2004 letter to Hasbro read:

> Dear Mr. Nagler [Hasbro General Counsel]:
>
> I spoke with Pauline Sonek, your associate, regarding information that my client is willing to share, for a finder's fee, involving millions of dollars in royalties that your firm did not receive due to some rather dubious accounting practices.
>
> It is my understanding that you are authorized to enter into a binding written agreement for a percentage of whatever your firm recovers as a result of the information my client is in a position to provide.
>
> My client is not, and never has been an employee of Hasbro.
>
> Please be good enough to give me a call regarding the percentage your firm is willing to part with, and under what conditions, as soon as possible. It is my understanding that time is of the essence.

See Ziems Dec., Tab 1.

Venturi's letter set off a flurry of correspondence and telephone communications between Venturi in California and various Hasbro employees in Rhode Island. See Ziems Dec., Tabs 1-8. Over the next few months, Venturi negotiated a percentage stake in the outcome of the consequent Hasbro-Mikohn dispute for Ferl. Complaint ¶¶ 26-29. Throughout these negotiations, Venturi repeatedly asserted that there was an "understatement of royalties due Hasbro" by Mikohn, and alleged that Mikohn had committed some unnamed breach of its obligations to Hasbro.

These negotiations culminated on October 1, 2004 with a "Finder's Fee Agreement," which, by its express terms, was governed by the internal laws of Rhode Island. Id. at ¶ 27; "Finder's Fee Agreement" ¶9(b), attached as Tab 5 of Ziems Dec. (hereafter cited as "FFA ¶ ______"). The "Finder's Fee Agreement" provided that "Attorney Venturi has informed Hasbro

that his client, [John Ferl], is willing to share with Hasbro, for a finder's fee, information involving millions of dollars in royalties that Hasbro should have but did not receive due to the improper and/or unethical accounting practices of an undisclosed licensee of Hasbro." Id. at p. 1. In an October 1, 2004 telephone conversation between defendants and Hasbro, Ferl accused Mikohn of being the unethical and underpaying licensee. See Ziems Dec, Tab 9.

Beyond falsely accusing Mikohn of "improper and/or unethical accounting practices," Venturi and Ferl attempted to cover their tracks by negotiating for a provision preventing Hasbro from "disclos[ing Ferl's] name and [Ferl's] sources to [Mikohn] or any other third-party, without the consent of [Ferl]…." FFA ¶2(b).

Hasbro, for its part, took pains to distance itself from Venturi and Ferl, and explicitly provided in the Finder's Fee Agreement that:

> Nothing in this Agreement is intended to or may constitute the parties as partners or joint venturers, or any party as the agent of the other party, except that Attorney Venturi is the agent of [Ferl].

FFA ¶9(d).

The "Finder's Fee Agreement" also made accommodations for the litigation that presumably would result from the "information" that Venturi and Ferl sold to Hasbro. When it defines "Net Underpaid Royalties Received" (the figure on which Venturi's and Ferl's percentage stake in the litigation was to be calculated), it exempts "all costs, expenses and charges … including, without limitations costs, fees, expenses and charges, including disbursements of **attorneys** … and those working for or on behalf of **attorneys**…." FFA at ¶1(a) (emphasis added). It also provides that "An amount shall not be counted toward Net Underpaid Royalties Received unless and until Hasbro has collected the same and is not subject to any **counterclaims or appeals** of [Mikohn]…." Id. (emphasis added). The Finder's Fee

Agreement also provides that "Hasbro may disclose [Ferl's identity] in connection with any **litigation,** arbitration or other proceeding with respect to the matters that are the Subject of this Agreement**, including, without limitation, any litigation involving Hasbro and [Mikohn]** …." FFA ¶2(b) (emphasis added). Further still, the Finder's Fee Agreement obligated Ferl to "provide reasonable assistance to and cooperation with Hasbro in connection with the … **prosecution of any claims by Hasbro against [Mikohn]**." FFA ¶5 (emphasis added).

Even after Venturi and Ferl had executed the Finder's Fee Agreement, the pair sought to advise and encourage more such litigation for profit – litigation in which they, again, had no legitimate interest. In January of 2005, Venturi sent Hasbro another letter, pandering yet another claim against Mikohn. The letter stated:

> I left you a phone message last week regarding what appears to be yet another, though more recent, and somewhat different kind of breach on the part of Mikohn, that my client asked me to bring to your attention…. I propose the following finders fee, 10 percent, with half, or 5 per cent of the recoverable loss paid "up front"….

Ziems Dec., Tab 8. It is not clear whether this solicitation prompted another agreement.

Now, after years of litigation and millions spent on the Hasbro/Mikohn litigation, reputations sullied and a long and prosperous business relationship ruined, Ferl seeks to dismiss Mikohn's complaint and avoid responsibility for the mess. None of Ferl's arguments has merit.

## DISCUSSION

### I. This Court Has Specific Personal Jurisdiction Over Ferl

In determining whether the Court has personal jurisdiction over a defendant, the court typically employs "the *prima facie* method." Adelson v. Hananel, 510 F.3d 43, 48 (1st Cir. 2007). Under this method, the plaintiff must "make the showing as to every fact required to satisfy 'both the forum's long arm statute and the due process clause of the Constitution.'"

Hainey v. World AM Comm., Inc., 263 F. Supp. 2d 338, 341 (D. R.I. 2003). "The Court accepts the plaintiff's properly documented evidentiary proffers as true for purposes of determining the adequacy of the *prima facie* showing." Id.

Rhode Island's long arm statute, R.I. Gen. Laws § 9-5-33(a), "authorizes assertion of personal jurisdiction to the fullest extent permitted by the United States Constitution." Tower Mfg. Corp. v. Shanghai Ele Mfg. Corp., C.A. No. 06-107S, 2008 WL 318334, *5 (D. R.I. Feb. 5, 2008). Therefore, "the question here is whether asserting personal jurisdiction over [Ferl] is consistent with the Due Process Clause." Id. The Due Process Clause permits the court to exercise personal jurisdiction over defendants who have sufficient minimum contacts with the forum state, such that "'maintenance of the suit does not offend 'traditional notions of fair play and substantial justice."' Adelson, 510 F.3d at 49 (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).

There are two types of personal jurisdiction: general and specific. Hainey, 263 F. Supp. 2d at 341. When, as here, a plaintiff focuses its argument on specific jurisdiction, the minimum contacts analysis is broken "into three categories – relatedness, purposeful availment and reasonableness:

> 'First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable. Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable.'"

Adelson, 510 F.3d at 49 (citation omitted). In the end, however, "[d]ivining personal jurisdiction is 'more an art than a science."' Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 206 (1st Cir. 1994) (quoting Donatelli v. National Hockey League, 893 F.2d 459, 468 n. 7 (1st Cir. 1990)).

With respect to this Court's personal jurisdiction over Ferl, it is important to note that "[f]or purposes of personal jurisdiction, the actions of an agent may be attributed to the principal." Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 55 (1st Cir. 2002). Therefore, because Venturi was acting as Ferl's agent at all times discussed herein,[2] Venturi's actions factor into the determination of whether this Court has personal jurisdiction over Ferl. Id.

As is discussed below, specific personal jurisdiction is appropriate because Mikohn's claims[3] relate directly to Ferl's purposeful contacts with Hasbro in Rhode Island and it was foreseeable that he would be haled into court in Rhode Island to account for damages caused by such contacts.

**A. Relatedness**

"Generally, relatedness refers to the requirement that the underlying claim 'arise out of' or be 'related to' the activities within the forum state. The relatedness standard is a 'flexible, relaxed standard,' … which focuses on the 'nexus between the defendant's contacts and the plaintiff's cause of action.'" Adelson, 510 F.3d at 49 (quoting Pritzker v. Yari, 42 F.3d 53, 61 (1st Cir. 1994) and Ticketmaster-New York, Inc., 26 F.3d at 206); Reed & Reed, Inc. v. George R. Cairns & Sons, Inc., 519 F. Supp. 2d 148, 154 (D. Me. 2007) (holding that tort claims arising out of a contractual relationship were sufficiently related to communications soliciting contract).

The First Circuit's opinion in Nowak v. Tak How Investments, Ltd., 94 F.3d 708, 715 (1st Cir. 1996), is particularly instructive on the "relatedness" issue because, like in this case, the

[2] Venturi Declaration at ¶ 5; Ziems Dec., Tabs 1-9.

[3] When multiple claims are asserted, the specific jurisdiction analysis must be applied to each claim because '"[q]uestions of specific jurisdiction are always tied to the particular claims asserted."' Hainey, 263 F. Supp. 2d at 344 (quoting Phillips Exeter Academy v. Howard Phillips Fund, Inc., 196 F.3d 284, 289 (1st Cir. 1999)). In this case, each of the claims asserted by Mikohn are predicated on the same conduct and, therefore, the analyses overlap.

plaintiff's tort claims in Nowak arose out of the defendant's contractual relationship with a third party located in the forum state. In Nowak, the Massachusetts plaintiff ("Nowak") sued the Hong Kong defendant ("Tak How") in Massachusetts after Nowak's wife drowned in Tak How's hotel pool while accompanying Nowak on a business trip to Hong Kong. The Nowaks' stay at Tak How's hotel was arranged by Nowak's Massachusetts employer, Kiddie Products, Inc. ("Kiddie"), who had an ongoing contractual relationship with Tak How. Tak How moved to dismiss Nowak's wrongful death claim for lack of personal jurisdiction.

In affirming the district court's denial of Tak How's motion, the First Circuit explained that when a tort "grows out of" a contract, foreseeability "informs" the relatedness inquiry. Id. at 715. Ultimately, the court agreed that Tak How's solicitation of business from Kiddie "set in motion a chain of reasonably foreseeable events resulting in Mrs. Nowak's death." Id. As the court explained, it "was in no sense remote or unpredictable" that Tak How's solicitation of Kiddie would prove successful and that one or more of the guests would use the pool. Id. Therefore, the relatedness prong was satisfied because there was "a meaningful link between Tak How's contact and the harm suffered…." Id.

Plant Genetic Systems, N.V. v. Ciba Seeds et al., 933 F. Supp. 519 (D. N.C. 1996), also is instructive because, like in this case and in Nowak, the causes of action against the non-resident defendant arose out of the non-resident defendant's contract with a resident company. In Plant Genetic Systems, the plaintiff, Plant Genetic Systems, N.V. ("PGS") sued defendants Ciba Seeds ("Ciba") (a North Carolina entity), and Mycogen Plant Science, Inc. ("MPSI") (a California company) for patent infringement in North Carolina. Plaintiff PGS argued that defendants Ciba and MPSI "actively induced each other and third parties to commit infringing activity in the Middle District of North Carolina" by entering an agreement to exchange

information and technology that plaintiff PGS claimed was protected under its patent. Id. at 523. The court agreed and held that MPSI was subject to personal jurisdiction in North Carolina by virtue of its agreement[4] with the North Carolina company, which was the gravamen of plaintiff PGS's infringement claim. Id. at 525.

This case is on all fours with Nowak and Plant Genetic Systems, N.V. Ferl made and/or directed Venturi to make several contacts to Rhode Island that resulted in a contract that directly gave rise to each of plaintiffs' tort claims. Those communications include, but are not necessarily limited to, the following:

- July 21, 2004 – Letter to Hasbro's Vice President and General Counsel, Barry Nagler, Esq., in Rhode Island accusing one of Hasbro's licensees of improperly underpaying "millions of dollars in royalties… due to some rather dubious accounting practices." See Ziems Dec., Tab 1.

- September, 2004 – Telephone messages to Hasbro's Senior Vice President and General Counsel, Bruce Kelly, in Rhode Island concerning negotiation of "finder's fee agreement." Id., Tab 2.

- September 8, 2004 – Letter to Hasbro (Mr. Kelly) in Rhode Island confirming negotiation of "finder's fee agreement" and request to coordinate with Hasbro to "get going on a collection strategy." Id.

- September, 2004 - Telephone conversations with Hasbro (Mr. Kelly and Barbra Finigan, Esq.) in Rhode Island[5] concerning negotiation of Finder's Fee Agreement. Id., Tab 9 at p. 35:2-20.

- September 27, 2004 – Letter faxed and mailed to Hasbro (Mr. Kelly) in Rhode Island enclosing signed "finder's fee agreement," which is governed by Rhode

[4] MPSI argued that it was a nominal signatory to the agreement and did not actually assume any obligations under the agreement because it signed the agreement only as a managing partner of Agrigenetisc, L.P. ("Agrigenetics") and, therefore, the agreement was only between Agrigenetics and Ciba. Plant Genetic Systems, N.V., 933 F. Supp. at 524. After analyzing the corporate and partnership structures of MPSI and Agrigenetics, the court concluded that MPSI would be subject to personal jurisdiction to the same extent that Agrigenetics would be. Id.

[5] Plaintiff assumes, but cannot be certain, that Mr. Kelly and Ms. Finigan participated in these conversations from Rhode Island. To the extent Ferl contests this fact, plaintiff respectfully requests an evidentiary hearing.

Island law and contains a non-exclusive Rhode Island forum selection clause. Id., Tab 3 and FFA ¶ 9(b).

- October 1, 2004 – Telephone call between defendants (Ferl and Venturi) and Hasbro (Mr. Kelly, Ms. Finigan, and multiple Hasbro auditors) in Rhode Island, during which defendant Ferl accuses plaintiff of "deceiv[ing] Hasbro." Id., Tab 9 at 37:20-39:22.

- October 15, 2004 – Telephone conversation and follow-up letter to Hasbro (Mr. Kelly) in Rhode Island concerning Hasbro's "investigation" into the allegations against plaintiff. Id., Tab 6.

- November/December, 2004 – Telephone messages to Hasbro (Mr. Kelly) in Rhode Island following up on status of investigation into allegations against plaintiff. Id., Tab 7.

- December 10, 2004 – Fax to Hasbro (Mr. Kelly) in Rhode Island "RE: Finder's fee – understatement of Royalties due Hasbro" and expressing his hopes "for a nice Christmas present," i.e., payment by Hasbro pursuant to the Finder's Fee Agreement. See id.

- January, 2005 – Phone message to Hasbro (Mr. Kelly) regarding additional accusation a "somewhat different kind of breach" by plaintiff. Id., Tab 8.

- January 29, 2005 – Letter to Hasbro (Mr. Kelly) regarding additional accusation a "somewhat different kind of breach" by plaintiff and requesting a "somewhat higher" finder's fee percentage. See id.

Every one of these contacts is integrally related to Mikohn's claims. Indeed, this entire lawsuit (as well as the Hasbro/Mikohn litigation) has its genesis in oral and written communications to and with Hasbro in Rhode Island that were made by or at the direction of Mr. Ferl. These communications were the catalyst for Hasbro's lawsuit against Mikohn in Rhode Island, which caused Mikohn to suffer the damages sought in this case. These communications constitute the actual interference with Mikohn's business and contractual relationship with Mikohn. See Complaint, Counts II and III. These communications form the basis of Mikohn's defamation claims. Id., Count IV. Venturi's and Ferl's communications and Finder's Fee Agreement with Hasbro are the operative facts that support Mikohn's claims for maintenance

and unjust enrichment. Id., Counts I and V. The October 1, 2004, telephone conversation between defendants and Hasbro in Rhode Island is a significant step in the conspiracy between defendants. Id., Count VI.

It was not "remote or unpredictable" that Venturi's and Ferl's solicitation of Hasbro in Rhode Island would harm Mikohn. Nowak, 94 F.3d at 715. To be sure, the ultimate purpose of their communications was to provide information with the hope of extracting money from Mikohn. It was beyond foreseeable that telling a corporate colossus like Hasbro that it had been short changed "millions of dollars in royalties… due to some rather dubious accounting practices" would lead to litigation, monetary loss and damage to character and reputation of Mikohn. Indeed, the Finder's Fee Agreement itself recognizes:

- "'Net Underpaid Royalties Received' [the figure on which Venturi's and Ferl's stake in the litigation was to be calculated], shall mean amounts actually received from Hasbro by [Mikohn] … less … all costs, expenses and charges … including, without limitations costs, fees, expenses and disbursements, of **attorneys** … and those working for or on behalf of **attorneys**…." FFA at ¶1(a) (emphasis added).

- "An amount shall not be counted toward 'Net Underpaid Royalties Received' unless … [it] is not subject to any **counterclaims or appeals** of [Mikohn]…." Id. (emphasis added).

- "Hasbro may disclose [Ferl's identity] in connection with any **litigation,** arbitration or other proceding with respect to the matters that are the Subject of this Agreement, **including, without limitation, any litigation involving Hasbro and [Mikohn]** …." Id, at ¶2(b) (emphasis added).

- Further still, the Finder's Fee Agreement obligated Ferl to "provide reasonable assistance to and cooperation with Hasbro in connection with the … **prosecution of any claims by Hasbro against [Mikohn]**." Id., at ¶5 (emphasis added).

Litigation between Hasbro and Mikohn was not only foreseeable, it actually was foreseen and accounted for. Therefore, Mikohn respectfully submits that its claims against Ferl are sufficiently related to his Rhode Island contacts and satisfy the "relatedness" prong of the jurisdictional inquiry.

**B. Purposeful Availment**

"The purposeful availment requirement ensures that jurisdiction is not premised on 'random, isolated, or fortuitous' contacts with the forum state, … but rather guarantees that the exercise of jurisdiction is 'fair, just, or reasonable.'" Nowak, 94 F.3d at 716 (citation omitted). "Voluntariness and foreseeability" are the "focal points" of the purposeful availment analysis. Id. "[A] defendant need only have one contact with the forum state, so long as that contact is meaningful." Id. at 717.

Ferl's contacts with Rhode Island, both individually and through Venturi, were purely voluntary. There is no doubt that his initial communication to Hasbro was unsolicited. See Ziems Dec., Tab 1. It is equally clear that the ensuing communications were motivated by "an obvious financial interest in continuing business with" Hasbro and were "designed to facilitate that business relationship." Nowak, 94 F.3d at 717. Therefore, the "voluntariness" requirement is readily established. See id. (confirming that repeated communications to a company in the forum state for purpose of fostering or developing a business relationship are voluntary). See also Reed & Reed, Inc. v. George R. Cairns & Sons, Inc., 519 F. Supp. 2d 148, 154 (D. Me. 2007) (holding that unsolicited communications to an entity in the forum state for the purpose of entering a contract are "purposeful" and sufficient to establish personal jurisdiction for torts arising out of the contract).

Moreover, as discussed above, it was foreseeable that Ferl could be subject to jurisdiction in Rhode Island to answer for damages caused by his Rhode Island contacts. Ferl derived an economic benefit, at Mikohn's expense, by directing and continuing his communications to Hasbro in Rhode Island. As the First Circuit has commented, "[e]xercising jurisdiction is

appropriate where the defendant purposefully derives economic benefits from its forum-state activities." Nowak, 94 F.3d at 717.

Because Ferl's contacts with Rhode Island were voluntary and it was foreseeable that he could be haled into a Rhode Island court as a result of such contacts, the "purposeful" component of the jurisdictional analysis is satisfied.

**C. Reasonableness**

The exercise of personal jurisdiction also must be reasonable. Adelson, 510 F.3d at 51. Reasonableness is determined based on consideration of a series of factors known as the "Gestalt factors." Id. "Those factors are:

> (1) the defendant's burden of appearing,
> (2) the forum state's interest in adjudicating the dispute,
> (3) the plaintiff's interest in obtaining convenient and effective relief,
> (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and
> (5) the common interests of all sovereigns in promoting substantive social policies."

Id. (quoting United Elec., Radio and Mach. Workers of Am. v. 163 Pleasant St. Corp., 960 F.2d 1080, 1088 (1st Cir. 1992)). Application of the "Gestalt factors" to this case demonstrates that it is eminently reasonable for this Court to exercise specific personal jurisdiction over Ferl.

Burden - "[T]he concept of burden is inherently relative, and, insofar as staging a defense in a foreign jurisdiction is almost always inconvenient and/or costly, … this factor is only meaningful where a party can demonstrate some kind of special or unusual burden." Pritzker v. Yari, 42 F.3d 53, 64 (1st Cir. 1994). Although Ferl lives in California, there is no indication that litigation in Rhode Island imposes a "special or unusual" burden on him. Adelson, 510 F.3d at 51 (concluding that it was not unusually burdensome to expect a legally blind diabetic who lives and works in Israel to litigate in Massachusetts). Indeed, Ferl agreed to come to Rhode Island to

be sure Hasbro made all proper payments owed under the Finder's Fee Agreement and, if necessary, to litigate with Hasbro. FFA ¶¶ 7 and 9(b). Mikohn is willing to work with Ferl to to minimize any inconvenience to him during this litigation.

Rhode Island's Interest in Adjudicating the Dispute – Rhode Island has a significant interest in this dispute. "Rhode Island has an interest in discouraging injuries that occur within the state…." Tower Mfg., 2008 WL 318334, at *11; Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 776-777 (1984) ("it is beyond dispute that [the forum state] has a significant interest in redressing injuries that actually occur within the State."). There is no question that Mikohn was injured in Rhode Island. The defamatory statements were directed to Hasbro in Rhode Island, thereby injuring Mikohn in Rhode Island. See, e.g., Keeton, 465 U.S. at 777 ("The tort of libel is generally held to occur wherever the offending material is circulated."); Scott v. Lackey, No. civ. A. 1:02-CV-1586, 2005 WL 2035598, *3 n.7 (M.D. Pa. 2005) (recognizing that defamation occurs in county where defamatory letter is received, rather than the place from where it was sent). The Hasbro/Mikohn litigation instigated by defendants occurred in Rhode Island and Mikohn expended considerable resources defending itself in Rhode Island. See Ziems Dec. ¶¶ 8-10.

Moreover, although Mikohn is not a Rhode Island corporation, Rhode Island's "interest extends to libel actions brought by nonresidents. False statements of fact harm both the subject of the falsehood **and** the readers of the statement." Keeton, 465 U.S. at 777 (emphasis added). Similarly, Rhode Island has an interest in assuring that contracts and business relationships involving in-state corporations such as Hasbro are not interfered with by third parties. Finally, the citizens of Rhode Island have a compelling interest in avoiding the expense and aggravation

of tying up judicial resources with litigation spawned by champertous and conspiratorial activities that are the subject of this lawsuit.

Mikohn's Interest – Mikohn's decision to initiate this matter in Rhode Island is an important factor to consider. Plaintiffs traditionally are granted deference in choosing their forum and such deference "weighs in favor of personal jurisdiction." Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A., 290 F.3d 42, 62 (1st Cir. 2002). It is inconsequential that Mikohn is a Nevada corporation because the personal jurisdiction "inquiry focuses on the relations among the **defendant**, the forum and the litigation." Keeton, 465 U.S. at 780 (emphasis added). Therefore, "plaintiff's residence in the forum State is not a separate requirement, and lack of residence will not defeat jurisdiction established on the basis of defendant's contacts." Id.

Mikohn's interest in litigating this action in Rhode Island is entirely justified. The attorneys who represented Mikohn in this lawsuit and in the Hasbro lawsuit are in Rhode Island. See Ziems Dec., ¶ 11. Those attorneys are intimately familiar with the complex factual nature of the Hasbro/Mikohn litigation, which will be a recurring theme throughout this case. Id. Litigation of this matter in California, as Ferl requests, would require Mikohn either to: a) expend further resources familiarizing new California counsel with the intricate facts of the prior Hasbro/Mikohn litigation, or 2) to hire additional local (California) counsel to assist Rhode Island counsel in an action in California. Id.

Judicial System's Interest - The judiciary has a strong interest in having this case litigated in Rhode Island. Efficient resolution of lawsuits is of paramount concern to the judiciary. Tower Mfg., 2008 WL 318334, at *11. This case has a lengthy and complex factual history. This Court already has devoted significant time familiarizing itself with many of the

factual details surrounding this case and the prior Hasbro litigation.[6] This Court already has determined that this case is related to the previous Hasbro/Mikohn litigation. See Dkt. Entry dated 1/10/08. Efficiency militates in favor of litigating this matter in Rhode Island.

States' Common Interest – As discussed, Rhode Island has a significant interest in this case because harm occurred here and defamatory statements were made here. California, in contrast, has no interest in this litigation.

Application of the Gestalt factors to the facts of this case demonstrates that it is reasonable for the Court to assume personal jurisdiction over Ferl in this case.

## II. This Court Is the Appropriate Venue in Which to Litigate the Claims Against Ferl

Ferl seeks to have this case transferred to California. Motions to transfer venue are governed by 28 U.S.C. § 1404(a), which provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." "A district court has broad discretion to decide whether a case should be transferred. However, the First Circuit has said that 'the burden of proof rests with the party seeking transfer' and that 'there is a strong presumption in favor of the plaintiff's choice of forum.'" Corvello v. New England Gas Co., Inc., C.A. No. 05-221T, 2008 WL 170065, *1 (D.R.I. January 15, 2008). "Inconvenience to the defendant is not sufficient to grant [a transfer request], when the transfer would merely shift the inconvenience to the other party." Brian Jackson & Co. v. Eximas Pharm. Corp., 248 F. Supp. 2d 31, 38 (D. R.I. 2003).

---

[6] For example, Ferl; might attempt to defend his actions on the basis that his statements were true and his actions were reasonable. In that circumstance, the propriety of Mikohn's conduct and the ultimate meaning of the royalty provision that was in dispute during the Hasbro/Mikohn litigation will be placed directly at issue in this case.

This matter should not be transferred to California. As discussed above, Mikohn has a legitimate interest in litigating this matter in Rhode Island and the "strong presumption in favor of" its choice to do so militates against transfer. Id. Mikohn has no senior managers or other employees with knowledge of the circumstances of this case in California, so it is not convenient for Mikohn to litigate there. Ziems Dec., ¶ 11. The operative facts took place in Rhode Island and Mikohn may have difficulty securing Hasbro witnesses to appear at a trial in California. Id. No witnesses will be inconvenienced by continuing this action in Rhode Island. Judicial economy will not be served by transferring the matter. As is discussed below, this matter is governed by Rhode Island law. Respectfully, in this circumstance, the Court should retain jurisdiction over the case and refuse to transfer the matter to California.

## III. Plaintiff Has Stated Claims Upon Which Relief Can Be Granted

When ruling on a motion to dismiss brought under Rule 12(b)(6), the Court "accept[s] the well-pleaded facts as true and indulge[s] all reasonable inferences therefrom" in the plaintiff's favor. Jorge v. Rumsfeld, 404 F.3d 556, 559 (1st Cir. 2005). If, "under any theory [Mikohn's allegations] are sufficient to state a cause of action in accordance with the law, [the Court] must deny the motion to dismiss." Vartanian v. Monsanto, 14 F.3d 697, 700 (1st Cir. 1994). "At the Rule 12(b)(6) stage, then, it is enough for a plaintiff to sketch a scenario which, if subsequently fleshed out by means of appropriate facts, could support an actionable claim…. This sets the bar quite low…." Garrett v. Tandy Corp., 295 F.3d 94, 105 (1st Cir. 2002).

### A. Mikohn Has Stated a Proper Claim For Champerty

Under Rhode Island law, champerty is an actionable tort. Toste Farm Corp. v. Hadbury, Inc., 798 A.2d 901, 905-06 (R.I. 2002). "'Put simply … champerty is maintaining a suit in return for a financial interest in the outcome….'" Id. at 905 (quoting In re Primus, 463 U.S. 412,

424 n.15 (1978)). Champerty is prohibited because "[t]he busybody, the deceiver, the vile knave, or unthrift, who excites others to litigation, with an intention to vex, and oppress, and by this means extort money, is an offender against public justice." Osprey, Inc. v. Cabana Ltd. P'ship, 532 S.E.2d 269, 273 (S.C. 2000) (cited in Toste Farm Corp., 798 A.2d at 905).

Ferl seeks dismissal of plaintiff's champerty count because: 1) he claims that California law is controlling, and 2) he claims that champerty is only actionable when a party "undertake[s] to pay the expenses of the litigation."

Additionally, Ferl claims that Venturi is not a proper defendant because "Defendant Venturi's duties [under the Finder's Fee Agreement] are not 'champertous,' but merely to vouch for the likelihood that [Ferl] has information which is true.... [I]t is clear that [Venturi] is acting on behalf of [Ferl]." Ferl Motion at 8. This argument would seem to have no bearing whatsoever on Ferl's liability; and, in fact, seems to concede the propriety of Ferl as a defendant in this action. Defendant Ferl's argument appears to have been carelessly imported from defendant Venturi's motion to dismiss and has no place in this motion.[7]

## 1. <u>Rhode Island Law Governs This Dispute</u>

Ferl's assertion that Rhode Island Law does not govern Mikohn's champerty claim is unfounded. As a preliminary matter, the champertous agreement itself has a choice of law clause that provides: "This Agreement shall be construed and enforced in accordance with the internal laws of the State of Rhode Island, without giving effect to conflict of laws principles." FFA at ¶ 9(b). Thus, Ferl would appear to have waived any argument that Rhode Island law does not govern.

---

[7] To the extent that Ferl's (unavailing) argument that Venturi is somehow shielded from tort liability because he was acting on Ferl's behalf has a place Ferl's motion to dismiss, plaintiff incorporates its discussion on this issue from it Objection to Defendant Venturi's Motion to Dismiss. See Memorandum In Support Of Plaintiff's Objection To Defendant Greg Venturi's Motion To Dismiss Or To Transfer at § III(A)(3).

Even if the Court were to apply a conflict of laws analysis, however, it is apparent that Rhode Island controls. The Rhode Island Supreme Court "has adopted an interest-weighing test in tort actions to determine which law will be applied when the facts of a particular case implicate the interests of multiple states. 'Under the interest-weighing approach, this Court will determine which state 'bears the most significant relationship to the event and the parties.'" Oyola v. Burgos, 864 A.2d 624, 627 (R.I. 2005) (citations omitted).

The champertous contract was: 1) negotiated and drafted in Rhode Island, 2) with a Rhode Island party, and 3) governed by Rhode Island law. Ferl's actions and the actions taken at Ferl's direction and on Ferl's behalf were designed to provoke and assist litigation that would take place in Rhode Island, and such litigation did, in fact, take place in Rhode Island. Finally, Mikohn was damaged in Rhode Island. See Part I(c) supra. Therefore, it is apparent that Rhode Island law has the most significant relationship to the event and the parties.

**2. Under Rhode Island Law, Ferl's Actions Were Champertous**

Ferl argues that, as a matter of law, his actions do not amount to champerty. His position is that "an agreement is not champertous … where the party supplying information or evidence does not undertake to pay the expenses of the litigation…." Venturi Motion at 8. To support this argument, however, Ferl relies exclusively on a forty year old decision from a Pennsylvania court, Belefonte v. Miller, 242 A.2d 150 (Pa. Super. 1968). Rhode Island law defines champerty more broadly than the Belefonte decision.

The Rhode Island Supreme Court recently discussed the torts of champerty and maintenance and their continued vitality under Rhode Island law. In Toste Farm, an attorney advised and paid for his client to initiate allegedly baseless litigation against the client's former business partner. The former partner contended that the attorney's motivation for advising and

funding the lawsuit was to avoid a potential malpractice claim by the attorney's client. The former partner sued the attorney for maintenance and then settled the allegedly baseless partnership dispute. The Superior Court subsequently dismissed the former partner's maintenance claim against the attorney and the former partner appealed.

On appeal, the Supreme Court held as a threshold matter that:

> [While t]he modern trend among many courts is to abolish [causes of action for maintenance and champerty]… [i]n this jurisdiction, **laws that existed at common law remain applicable in Rhode Island** …. This Court has previously recognized the common law doctrines of maintenance and champerty. In Kelley [v. Blanchard, 34 R.I. 57, 60-61, 82 A. 728, 729 (1912)], this Court noted that "[a]lthough nearly half a century has elapsed since [Martin v. Clarke, 8 R.I. 389 (1866), the opinion adopting these doctrines], it has never been overruled, doubted or denied, and the same remains the law of the state. Neither has the [L]egislature seen fit to modify the law as expressed in [Martin]."… Thus, **maintenance remains a recognized cause of action in Rhode Island**.

Toste Farm, 798 A.2d at 905-06 (emphasis added) (quoting Kelley v. Blanchard, 82 A. 728, 729 (R.I. 1912)).

In describing the torts, the Supreme Court explained that "maintenance is **helping** another prosecute a suit; champerty is maintaining a suit in return for a financial interest in the outcome; and barratry is a continuing practice of maintenance or champerty.'" Toste Farm, 798 A.2d at 905 (emphasis added) (quoting In re Primus, 463 U.S. 412, 424 n.15 (1978)). The Supreme Court then reversed and remanded for litigation of the maintenance claim because, if the former partner's allegations were true, "[t]his is exactly the type of agreement that is prohibited by the doctrine of maintenance." Id. at 906.

As Toste Farm makes clear, the lynchpin of a champerty or maintenance claim under Rhode Island law is **helping** another prosecute a suit. See id.[8] Rhode Island's broad treatment of the champerty doctrine is consistent with the English common law. An early treatise on the subject describes the common law of champerty and maintenance as follows:

> A malicious or, at least, officious, interference in a suit in which the offender has no interest, to assist one of the parties to it against the other, with money **or advice to prosecute** or defend the action without any authority at law.

John Bouvier, Bouvier's Law Dictionary and Concise Encyclopedia 2064 (3d revision 1914) (emphasis added) (citing Russel1 on Crime, 1 Russ Cr. 176).

Thus, it is clear that the broader English common law rules of maintenance and champerty survive in Rhode Island. The law of other states that have abandoned or narrowed the doctrines is of no moment. Accordingly, Ferl's reliance on Pennsylvania law is unavailing. Under Rhode Island law, Mikohn's complaint states a valid claim for champerty. Like the encouraging attorney who was liable for maintenance in Toste Farm, Ferl intentionally stirred up and helped litigation in which he had no justifiable interest, purely for his own financial gain.

Plainly Ferl and Venturi helped Hasbro prosecute the litigation against Mikohn. They provided Hasbro with the contract interpretation at the heart of that litigation. They provided the

---

[8] To plaintiff's knowledge, the Rhode Island Supreme Court has only once afforded any measure of tolerance for an arguably champertous agreement. In Sparne v. Altshulter, 80 R.I. 104, 90 A.2d 919, 923 (1952), a genealogical company notified an unknown heir of a wealthy intestate decedent that she might be a beneficiary in exchange for ten percent of the inheritance. The heir inherited but refused to pay. The genealogy company sued, and won specifically because the heir had freely contracted to pay the ten percent. The Court stated:

> The circumstances that a private contract may be improvident or hard, or prompted by motives on one side or the other perhaps not commendable in the forum of conscience, do not alone constitute ground for **refusal to enforce an agreement intelligently and freely made by competent parties standing on an equal footing and by them put under seal**.

Id. (emphasis added). This case is easily distinguished from Sparne because Mikohn does not raise champerty as a defense to a contract claim. Rather, as in Toste Farm, Mikohn asserts champerty as an actionable tort. Mikohn was the victim of Ferl's champertous acts. Thus, the Sparne Court's tolerance is inapposite.

dispute. Moreover, the Finder's Fee Agreement obligated Ferl to "provide reasonable assistance to and cooperation with the … prosecution of any claims by Hasbro against [Mikohn]." FFA at ¶5.

It is equally clear that Venturi and Ferl's assistance was directed toward encouraging litigation. As is detailed more fully above, the Finder's Fee Agreement is rife with allusions to the impending Hasbro/Mikohn litigation. See Part I(A), supra. Thus, Venturi's and Ferl's actions specifically were designed to advise and assist in Hasbro's litigation.

Ferl's claim that "Hasbro has the sole discretion as to whether to proceed with a suit," Ferl Motion at 8, does not mean that his role in inciting the Hasbro/Mikohn litigation was not champertous. The fact that Hasbro did not rescue Venturi and Ferl from committing champerty by declining to prosecute does not save them. The same could have been said in Toste Farm, where the champertous attorneys maintained a lawsuit in which they had no legitimate interest for the purposes of avoiding a malpractice suit. The mere fact that the clients of the attorneys in Toste Farm could have refused their lawyers' tortious offer to fund and assist with the partnership litigation did not change that fact that those lawyers ultimately committed champerty. Nor does it change that fact that Venturi and Ferl committed champerty here.

Venturi and Ferl are the very definition of officious intermeddlers. They approached Hasbro unsolicited and provoked, promoted and assisted in litigation in which they had no legitimate interest. They are just the "'busybod[ies], the deceiver[s], the vile knave[s], or unthrift[s], who excite[] others to litigation, with an intention to vex, and oppress, and by this means extort money"' that the doctrine of champerty is designed to discourage. See Osprey, Inc., 532 S.E.2d at 376 (quoting State v. Chitty, 17 S.C.L. (1 Bail) 379, 399-401 (S.C. App. 1830)).

**B. Mikohn Has Stated a Proper Claim For Defamation**

Ferl does not seriously[9] challenge the sufficiency of Mikohn's defamation pleading. Rather, he seeks dismissal of Mikohn's defamation claim based on certain affirmative defenses - statute of limitations and privilege. "Dismissing a case under Rule 12(b)(6) on the basis of an affirmative defense requires that '(i) the facts establishing the defense are definitively ascertainable from the complaint and the other allowable sources of information, and (ii) those facts suffice to establish the affirmative defense with certitude.'" Nisselson v. Lernout, 469 F.3d 143, 150 (1st Cir. 2006) (citation omitted).

**1. Statute of Limitations**

A claim for libel is subject to a three year statute of limitations. Mikaelian v. Drug Abuse Unit, 501 A.2d 721, 723 (R.I. 1985).[10] The complaint alleges that Ferl sent multiple libelous letters to Hasbro between July 2004 and January 2005. Complaint, ¶ 54. The most recent correspondence, dated January 29, 2005, clearly was sent less than three years before Mikohn filed its complaint on January 9, 2008. See Complaint ¶ 31; Ziems Dec., Tab 8. Therefore, at a minimum, this libelous statement does not raise any statute of limitation issues.

With respect to the multiple libelous letters sent between July 2004 and December 2004, the discovery rule defeats Ferl's statute of limitations defense. The discovery rule applies to defamation cases and provides "that the statute of limitations does not begin to run until the plaintiff 'discovers, or with reasonable diligence should have discovered, the wrongful conduct of the [defendant].' " Mills v. Toselli, 819 A.2d 202, 205 (R.I. 2003) (citation omitted); Collins

[9] Ferl claims that Mikohn does not allege that his actionable comments were false. See Ferl Motion at p. 10. That is incorrect. See Complaint ¶¶ 54 and 56.

[10] Mikohn concedes that claims for slander would be barred by the shorter statute of limitations set forth in R.I. Gen. Laws § 9-1-14(a).

v. Nuzzo, 244 F.3d 246, 253 (1st Cir. 2001) (applying the discovery rule to a Massachusetts defamation case).[11] "[T]he discovery rule is appropriate for libel cases which arise out of confidential business memoranda when the plaintiff has no means, in the exercise of reasonable diligence, of discovering the existence of the cause of action." Kittinger v. Boeing Co., 585 P.2d 812, 814 (Wash. App. 1978).

To the extent Ferl might dispute the confidentiality of his libelous letters to Hasbro and the availability to Mikohn of the information concerning his tortious acts, that is for the jury to decide. However, accepting the allegations of the complaint as true and drawing all reasonable inferences in favor of Mikohn, it is apparent (and the evidence ultimately will show) that it was impossible for Mikohn to have known about **any** of Ferl's tortious conduct until Hasbro was ordered to disclose that information in October 2005 during the Hasbro/Mikohn litigation.[12] Complaint ¶ 35. None of the libelous letters were directed to Mikohn. There was no reason for Mikohn to have suspected that the letters would be sent to Hasbro. The existence of the Finder's Fee Agreement was confidential. See FFA ¶ 2(b). Hasbro steadfastly maintained that confidentiality and refused to disclose Venturi's and Ferl's statements or identities until Mikohn obtained a court order compelling such disclosure. Accordingly, the discovery rule permits Mikohn to seek recovery for **all** of the defamatory letters that Venturi sent to Hasbro at Ferl's direction and on Ferl's behalf. See id.; White v. Gurnsey, 618 P.2d 975, 978 (Or. App. 1980)

[11] A defamation case predicated on spoken words, i.e., slander, is subject to a "compelling-circumstances test for applying the discovery rule" because such claims are specifically subject to a one year statute of limitations pursuant § 9-1-14(a). Mills v. Toselli, 819 A.2d 202, 206, n.2 (R.I. 2003). Because defamation claims based on written words, i.e., libel, are not governed by a specific statute of limitations, however, such claims "more readily support[] the application of a discovery rule…." See id.

[12] To the extent that the Court believes that the Complaint does not set forth sufficient facts to apply the discovery rule, Mikohn respectfully requests leave to amend the complaint accordingly. Stone v. Colt Industries Operating Corp., 1986 WL 13073, *2 (D. Mass. 1986) (*sua sponte* order for plaintiff to amend complaint to adequately allege reliance on the discovery rule).

(applying the discovery rule because the defamatory document "was confidential in nature and the initial publication was not of the type that plaintiff would be presumed to have known about, even in the exercise of reasonable diligence").

**2. <u>Privilege</u>**

Ferl also contends that his statements were absolutely privileged under California law because they were made during or prior to the Hasbro/Mikohn litigation. As discussed above, however, California law does not apply to this case. Under Rhode Island law, it is true that certain statements made **<u>during</u>** litigation are absolutely privileged. <u>Kissell v. Dunn</u>, 793 F. Supp. 389, 392-93 (D. R.I. 1992). However, Ferl was not an agent or employee of Hasbro and, therefore, his statements would not be cloaked with a litigation privilege by virtue of a lawsuit between Hasbro and Mikohn. Moreover, all the libelous letters were published to Hasbro **<u>before</u>** Hasbro sued Mikohn. Therefore, as a matter of law, none of the writings made at Ferl's direction and on Ferl's behalf are covered by the absolute litigation privilege. <u>Id.</u>

To the extent that Ferl attempts to take shelter under a conditional privilege, "[a] motion to dismiss is not the correct vehicle to attack a plaintiff's defamation claim by asserting a conditional privilege." <u>Chan v. Immunetics</u>, No. CIV. A. 98-0388D, 1999 WL 218490 at *5 (Mass. Super. April 7, 1999). This is because whether or not a statement may be conditionally privileged is driven by the facts. <u>Ponticelli v. Mine Safety Appliance Co.</u>, 247 A.2d 303, 307 (R.I. 1968). Rhode Island recognizes a conditional privilege that

> permits a person to escape liability for a false and defamatory statement made about another if the occasion for the publication is such that the publisher acting in good faith correctly or reasonably believes that he has a legal, moral or social duty to speak out, or that to speak out is necessary to protect either his own interests, or those of third person, or certain interests of the public. The occasion, of course, **<u>must not be abused</u>**.... [O]f course, there **<u>must be a reciprocity of duty between the publisher and the</u>**

> **person to whom the publication is addressed, and the circumstances should reasonably demonstrate that the recipients have an interest in receiving it corresponding to that of the publisher in making it.**

Id. at 305-06 (emphasis added).

There are no allegations in the complaint that definitively establish the facts required to support a conditional privilege "with certitude." Nisselson, 469 F.3d at 150. The complaint certainly does not charge Ferl with acting in good faith. There are no allegations that Ferl's conduct was driven by a moral or social duty, or was necessary to save his own interest or the public at large. There is no suggestion in the complaint that Ferl and Hasbro had reciprocal duties or common interests at the time the defamatory letters were published. If anything, the complaint suggests that Ferl's nefarious conduct was malicious, which destroys any privilege that might otherwise attach. Id. at 308. "Whether ill will or spite is the incentive for a publication is ordinarily for the jury to decide…." Id. Therefore, it would be improper to dismiss Mikohn's defamation claim on the basis of Ferl's conditional privilege defense.

As to Ferl's claim that his statements amounted to nothing more than "opinion," his arguments again fall flat. In determining whether an allegedly defamatory statement constitutes a representation of fact or opinion, the First Circuit has recognized that:

> [c]ontext makes the difference-and by "context" we mean such factors as the identity of the speaker, the identity of the audience, the circumstances in which the statement is made, what else is said in the course of the conversation, and a myriad of other considerations.

Garrett v. Tandy Corp., 295 F.3d 94, 104 (1st Cir. 2002). Labeling a statement as a fact or opinion presents a question of fact. Id. "A court only should dismiss a defamation claim as resting on non-actionable opinion when the challenged statement 'is incapable of a defamatory

interpretation.'" Id. (quoting Fortier v. Int'l Bhd. of Elec. Workers, Local 2327, 605 A.2d 79, 80 (Me. 1992)).

Neither the complaint, nor the actual defamatory letters, suggest that Ferl merely offered his opinion to Hasbro. To the contrary. In his initial communication to Hasbro, Ferl represented that Hasbro was underpaid millions of dollars "due to some rather dubious accounting practices." Ziems Dec., Tab 1; Beattie v. Fleet Nat. Bank, 746 A.2d 717, 727 (R.I. 2000) ("some jurisdictions have held that there is no protection for 'accusations that an individual has committed a crime or is personally dishonest….'") (quoting Gregory v. McDonnell Douglas Corp., 552 P.2d 425, 430 (Cal. 1976)). In the January 29, 2005 letter written at the direction of Ferl, Venturi accused Mikohn of a "different kind of breach." See Ziems Dec., Tab 8. In neither circumstance did Ferl discuss the basis for his accusations. C.f., Beattie, 46 A.2d at 727 (allegation of fraud not actionable because author disclosed basis of his belief). Clearly Ferl's statements were presented as facts, rather than opinion. At a minimum, it is apparent that Ferl's writings suggest that he possessed certain undisclosed, defamatory facts. Id. Therefore, Mikohn's defamation claims should not be dismissed and Mikohn "is entitled to discovery in order to clarify exactly what was said and to develop the facts necessary to put what was said in a meaningful context…." See Garrett, 295 F.3d at 104.

## C. Mikohn Has Stated Proper Claims for Defamation, Civil Conspiracy, Unjust Enrichment and Tortious Interference with Contract and Business Relations

Ferl argues that claims for "defamation, civil conspiracy, tortuous [sic] interference and unjust enrichment need actionable facts to be pleaded for them to be viable," but that Mikohn has failed to properly plead champerty or libel and, therefore, "the conclusions of defamation, civil conspiracy, tortuous [sic] interference … must all fail for lack of factual allegations which show liability." Ferl's Motion, at 10. A cursory comparison of Mikohn's complaint with the

substantive requirements of Mikohn's causes of action reveals that Venturi's argument carries no weight.

Mikohn's complaint properly states a cause of action for champerty (Count I). As is required in Toste Farm, 798 A.2d 901, Mikohn alleges that Ferl improperly helped Hasbro prosecute the Hasbro/Mikohn litigation in return for a financial interest in the outcome of that lawsuit. See Complaint ¶¶ 37-43 and Part III(A), supra. Therefore, Ferl's statement that "Mikohn has failed to properly plead champerty" is incorrect.

As for Mikohn's claims for tortious interference with contract and business relations, (Counts II and III), Mikohn's complaint again contains all the requisite averments. Compare Complaint ¶¶ 44-47 (interference with contract) with Western Mass. Blasting Corp. v. Metropolitan and Cas. Ins. Co., 783 A.2d 398, 401-02 (R.I. 2001) (identifying the "basic elements of a claim based on a tortious interference with a contractual relationship) and Complaint ¶¶ 48-52 (interference with business relations) with Mesolella v. City of Providence, 508 A.2d 661, 669 (R.I. 1986) (enumerating the elements to prove interference with business relations). To the extent that Ferl believes he might be able to avoid liability on these counts by proving his conduct was justified, that is for him to prove. Western Mass. Blasting Corp., 783 A.2d at 402; Mesolella, 508 A.2d at 669. Because the complaint does not certainly and definitively demonstrate that Ferl would prevail on a "justification" defense, Mikohn's tortious interference counts should not be dismissed. Nisselson, 469 F.3d at 150.

With respect to Mikohn's claim for defamation (Count IV), Rhode Island law requires proof of: "(1) the utterance of a false and defamatory statement concerning another; (2) an unprivileged communication to a third party; (3) fault amounting to at least negligence; and (4) damages." Avilla v. Newport Grand Jai Alai LLC, 935 A.2d 91, 95 (R.I. 2007) (citation

omitted). Mikohn's complaint contains the requisite allegations. Complaint ¶¶ 53-58. Further, as discussed in Part III(B) above, Venturi's statute of limitations and privilege arguments do not justify dismissal of this claim.

Mikohn's unjust enrichment claim (Count V) also is properly pled.

> To recover for unjust enrichment, a claimant must prove: (1) that he or she conferred a benefit upon the party from whom relief is sought; (2) that the recipient appreciated the benefit; and (3) that the recipient accepted the benefit under such circumstances "that it would be inequitable for [the recipient] to retain the benefit without paying the value thereof."

Dellagrotta v. Dellagrotta, 873 A.2d 101, 113-14 (R.I. 2005) (quoting Bouchard v. Price, 694 A.2d 670, 673 (R.I. 1997)). Every one of these elements is alleged in ¶¶ 59-63 of Mikohn's complaint. Therefore, contrary to Ferl's assertion, Mikohn has alleged "actionable facts" to support its claim for unjust enrichment.

Finally, Mikohn's civil conspiracy count (Count VI) is proper. "To prove a civil conspiracy, plaintiffs had to show evidence of an unlawful enterprise." Read & Lundy, Inc. v. Washington Trust Co. of Westerly, 840 A.2d 1099, 1102 (R.I. 2004). Again, Mikohn's complaint sets forth the requisite allegations. See Complaint ¶¶ 64-68. Although conspiracy "requires a valid underlying intentional tort theory,'" Read & Lundy, Inc., 840 A.2d at 1102 (quoting Guilbeault v. R.J. Reynolds Tobacco Co., 84 F. Supp. 2d 263, 268 (D. R.I. 2000)), as discussed above, Mikohn's complaint properly states claims for the underlying torts of champerty, tortious interference and defamation. Therefore, Mikohn's conspiracy count should not be dismissed.

## D. Ferl Is Not Protected By the Release Between Mikohn and Hasbro

### 1. Ferl's Argument That He Was Released From Liability For His Tortious Acts Is Not Proper In a Rule 12(b)(6) Motion

Notwithstanding the fact that Ferl admits in ¶ 5 of his declaration to never having seen the settlement agreement between Mikohn and Hasbro, he claims that he was covered by Mikohn's purported release of Hasbro from liability. Ferl's affirmative defense is not proper in the context of a 12(b)(6) motion. First, there is no mention in the complaint of a settlement between Mikohn and Hasbro. Second, even if there were such reference in the complaint, there are no facts pled that "establish … with certitude" that such a settlement was intended to cover Ferl.

In fact, Ferl candidly admits that he is "not aware of any of the terms of the settlement [of the Hasbro-Mikohn litigation], except for the amount of the settlement." Ferl Declaration at ¶5. If he does not know what the settlement agreement between Mikohn and Hasbro says, how can Ferl claim that the mere possible existence of a release between Mikohn and Hasbro establishes with certainty that he is covered by it?

Indeed, the actions of Mikohn and Hasbro (the parties to the purported settlement agreement), plainly suggest that Ferl was not covered by the release. Mikohn never agreed to release Ferl from liability for his actions. And Ferl's assertion that if his "motion were denied, [he] would cross-claim against Hasbro for implied or actual indemnity" suggests that Hasbro does not believe that he is covered. As far as the parties to the settlement are concerned, Mikohn has not released Venturi or Ferl.

**2. Neither Venturi nor Ferl are Agents of Hasbro**

Lacking any knowledge of the contents of the purported settlement release, Ferl claims that he "would be, whether champertous or not, an agent of Hasbro, a settling party, and presumably covered by the [purported] release covering the settlement." Ferl Motion at 11-12.

The terms of the Finder's Fee Agreement provide otherwise:

> No Joint Venture: Nothing in this Agreement is intended to or may constitute the parties as partners or joint venturers, or any party as the agent of the other party, except that attorney Venturi is the agent of [Ferl].

FFA ¶9(d).

As such, the sole document that defines Ferl's relationship with Hasbro unreservedly refutes his position that he is an "agent of Hasbro."

**IV. Ferl Improperly Relies on Evidence Outside of The Pleadings**

In his motion to dismiss, Ferl loses sight of the purposes and constraints of Rule 12(b)(6). Rule 12(b) provides that:

> If, on a motion asserting defense number (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided by in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion.

Fed. R. Civ. P. 12(b).

Curiously, Ferl included within his motion to dismiss a "Declaration in Support of Motion to Dismiss." The declaration begins: "If called upon to testify I can and would competently and with first hand knowledge, testify to the following." Ferl Declaration at ¶1. Most of the statements made in the declaration address the arguments he raises in support of his Rule 12(b)(6) motion. Id. ¶¶ 4-9, 10. Such a declaration is wholly inappropriate for

consideration in the context of a Rule 12(b)(6) motion, which focuses solely on the allegations of the complaint and plausible inferences drawn therefrom, and should not be considered.

## CONCLUSION

For the reasons set forth herein, Ferl's motion to dismiss should be denied and this Court should decline to transfer the matter to California.

Respectfully submitted,

/s/ Michael J. Daly

Brooks R. Magratten, No. 3585
Michael J. Daly, No. 6729
Thomas Connolly, No. 7497
VETTER & WHITE
Attorneys for Plaintiff
20 Washington Place
Providence, Rhode Island 02903
(401) 421-3060
(401) 272-6803 FAX
bmagratten@vetterandwhite.com
mdaly@vetterandwhite.com
tconnolly@vetterandwhite.com

Dated: March 24, 2008

**CERTIFICATE OF SERVICE**

To:

John A. Ferl
501 Hernondo St. No. 4
Hermosa Beach, CA 90254

Greg J. Venturi, Esq.
1533-1/2 Centinela Ave.
Santa Monica, CA 90404

I hereby certify that I caused to be served on the above-named individuals a copy of the within Memorandum by mailing first class mail, postage prepaid, on March 24, 2008. I further certify that I electronically filed this Memorandum on March 24, 2008 and that it is available for viewing and downloading from the Court's Electronic Case Filing System.

/s/ Michael J. Daly

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| PROGRESSIVE GAMING INTERNATIONAL CORPORATION, Plaintiff | ) | |
| v. | ) | C.A. No. 08-013/S |
| GREG VENTURI, and JOHN FERL, Defendants. | ) | |

**PLAINTIFF'S OBJECTION TO DEFENDANT JOHN FERL'S**
**MOTION TO DISMISS OR TO TRANSFER**

Plaintiff Progressive Gaming International Corporation ("PGIC") objects to defendant John Ferl's motion to dismiss or to transfer. PGIC files herewith a supporting memorandum of law.

PGIC respectfully requests a hearing on this objection and estimates that oral argument may require one hour.

Respectfully submitted,

/s/ Michael J. Daly

Brooks R. Magratten, No. 3585
Michael J. Daly, No. 6729
Thomas Connolly, No. 7497
VETTER & WHITE
Attorneys for Plaintiff
20 Washington Place
Providence, Rhode Island 02903
(401) 421-3060
(401) 272-6803 FAX
bmagratten@vetterandwhite.com
mdaly@vetterandwhite.com
tconnolly@vetterandwhite.com

Dated: March 24, 2008

**CERTIFICATE OF SERVICE**

To:

John A. Ferl
501 Hernondo St. No. 4
Hermosa Beach, CA 90254

Greg J. Venturi, Esq.
1533-1/2 Centinela Ave.
Santa Monica, CA 90404

I hereby certify that I caused to be served on the above-named individuals a copy of the within Objection by first class mail, postage prepaid, on March 24, 2008. I further certify that I electronically filed this Objection on March 24, 2008 and that it is available for viewing and downloading from the Court's Electronic Case Filing System.

/s/ Michael J. Daly