# EXHIBIT A

THE STATE v. CHARLES C. CHITTY.
S.C.App. 1830.

Court of Appeals of South Carolina.
THE STATE
v.
CHARLES C. CHITTY.
February Term, 1830.

A justice of the peace may be indicted, as a *common barretor*, for exciting the commencement of prosecutions for criminal offences; and it is not a sufficient defence, that the prosecutions were not groundless, if it appear, that they were promoted by the justice, with a view to exacting fees for afterwards suppressing them. Richardson, J. dissenting.

On the trial of an indictment against a justice of the peace for *barretry*, proof that the defendant exacted illegal fees, as the condition of compounding prosecutions, is admissible to shew the motive with which such prosecutions were excited by him. Proof of a distinct indictable offence is admissible in evidence, whenever it forms part of the *res gestae* of the offence for which the defendant is on his trial. *vide* State *v.* Houston, 17 S.C.L. 300.

The notice served on the defendant in an indictment for *barretry* forms no part of the record, and cannot furnish ground for a motion in arrest of judgment. Judgment cannot be arrested but for matter apparent upon the record. *vide* State *v.* Scott, 17 S.C.L. 270.

The St. 32 Hen 8, c. 9, P. L. 54. limiting suits and prosecutions for bracery, maintenance, champerty, &c. to one year after the offence committed, does not apply to indictments for *barretry;* nor does the Court otherwise possess any authority for exercising a discretion in limiting the period within which the prosecution must be commenced, or to which the evidence at the trial must be confined.

The punishment of *barretry* is by fine and imprisonment at the discretion of the Court: and if the offender be an attorney, or solicitor, his name will be stricken from the rolls.

Where the law has affixed a specific and infamous punishment to an offence, the Court will after conviction postpone the *execution* of the sentence, to afford the defendant an opportunity of applying to the Executive for a pardon. *Aliter*, where the punishment is discretionary with the Court. So, too, where the punishment consists of imprisonment, no reason exists for the postponement, as the defendant is liable to be committed after conviction, until his sentence is executed. Nor will the Court in any case postpone passing sentence, after dismissal of the appeal.

The right of the Governor under the Constitution, to grant a pardon after a conviction, but pending an appeal, is now too well settled to admit of doubt. *ob. dict*.

West Headnotes

**Champerty and Maintenance 74 ⚷9**

74 Champerty and Maintenance
74k8 Criminal Responsibility
74k9 k. Offenses. Most Cited Cases
A justice of the peace may be indicted, as a common barretor, for exciting the commencement of prosecutions for criminal offences; and it is not a sufficient defence, that the prosecutions were not groundless, if it appear that they were promoted by the justice, with a view to exacting fees for afterwards suppressing them. Richardson, J., dissenting.

**Champerty and Maintenance 74 ⚷10**

74 Champerty and Maintenance
74k8 Criminal Responsibility
74k10 k. Prosecution and Punishment. Most Cited Cases
On the trial of an indictment against a justice of the peace for barratry, proof that the defendant exacted illegal fees, as the condition of compounding prosecutions, is admissible to show the motive with which such prosecutions were excited by him. Proof of a distinct indictable offence is admissible in evidence, whenever it forms part of the res gestæ of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the offence for which the defendant is on his trial. Vide State v. Houston,ante, p. 300.

**Champerty and Maintenance 74 ⚷10**

74 Champerty and Maintenance
  74k8 Criminal Responsibility
    74k10 k. Prosecution and Punishment. Most Cited Cases
The punishment of barratry is by the and imprisonment at the discretion of the Court: and if the offender be an attorney, or solicitor, his name will be stricken from the rolls.

**Champerty and Maintenance 74 ⚷10**

74 Champerty and Maintenance
  74k8 Criminal Responsibility
    74k10 k. Prosecution and Punishment. Most Cited Cases
The statute 32 Hen. VIII, c. 9, limiting suits and prosecutions for champerty, etc., to one year after the commission of the offense, does not apply to indictments for barratry.

**Criminal Law 110 ⚷147**

110 Criminal Law
  110X Limitation of Prosecutions
    110k147 k. Limitations Applicable. Most Cited Cases
Pub.Laws, p. 54, limiting suits for maintenance and champerty to one year after the offense is committed, does not apply to indictments for barratry, since it is not mentioned therein, and is not an offense that can be committed by a single act.

**Criminal Law 110 ⚷968(1)**

110 Criminal Law
  110XXII Arrest of Judgment
    110k967 Grounds for Arrest of Judgment
      110k968 In General
        110k968(1) k. In General. Most Cited Cases
The notice served on a defendant indicted for barratry forms no part of the record, and furnishes no ground for a motion in arrest of judgment.

**Criminal Law 110 ⚷972**

110 Criminal Law
  110XXII Arrest of Judgment
    110k967 Grounds for Arrest of Judgment
      110k972 k. Matter Not Apparent of Record in General. Most Cited Cases
Judgment can only be arrested for matter appearing in the record, or for some matter which ought to appear and does not appear therein.

**Pardon and Parole 284 ⚷23.1**

284 Pardon and Parole
  284I In General
    284k23 Pardon
      284k23.1 k. In General. Most Cited Cases
  (Formerly 110k982.3(2))
The right of the Governor under the Constitution, to grant a pardon after a conviction, but pending an appeal, is now too well settled to admit of a doubt. ob. dict.

**Sentencing and Punishment 350H ⚷478**

350H Sentencing and Punishment
  350HII Sentencing Proceedings in General
    350HII(J) Stay of Execution of Sentence
      350Hk478 k. Grounds and Purposes. Most Cited Cases
  (Formerly 110k1001)
Where the law has affixed a specific and infamous punishment to an offense, the Court will after conviction postpone the execution of the sentence, to afford the defendant an opportunity of applying to the Executive for a pardon. Aliter, where the punishment is discretionary with the Court. So, too, where the punishment consists of imprisonment, no reason exists for the postponement, as the defendant is liable to be committed after conviction until his sentence is executed. Nor will the Court in any case postpone passing sentence, after dismissal of the appeal.

***1** Tried before Mr. Justice BAY, at Charleston, October Term, 1829.

THE indictment charged the defendant, who was a justice of the peace, and one of the quorum for Charleston District, with being a *common barretor;* and alleged, in general terms, that "divers quarrels, strifes, suits, and controversies, among the honest and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

quiet citizens of this State," he, the said defendant "did move, procure, stir up, and excite, to the evil example, &c."The defendant pleaded not guilty. Conformably to practice in relation to general indictments, the defendant was served with a notice in writing, of the particular acts of barretry, which would be relied on in behalf of the prosecution; and to these the evidence at the trial was confined.

The novelty of a prosecution for this offence, in the Courts of this State, has suggested the propriety of giving an abstract of the whole of the evidence adduced at the trial, for the purpose of exhibiting, specifically, the description and character of the acts, which may be considered as coming within the definition of barretry. And, for the convenience of reference, the different portions of the evidence have been arranged under the several specifications, contained in the notice served on the defendant, to which they are respectively applicable.

1st Specification. "A prosecution against Gustavus Dupre for larceny, respecting a watch in his possession, claimed by one Newhall."

Gustavus Dupre, a witness for the State, testified, as follows. On the 15th May, 1828, one John Smith, a seaman, called on witness and asked for a loan of $2, on the credit of a watch, which he agreed to leave in pledge; with which request witness complied. Some time afterwards Smith obtained a further sum of $9, on the credit of the watch. About the 1st June, another seaman called to inquire after the watch, which he claimed as his own, declaring that he had lent it to Smith. The watch remained in the possession of witness until the 29th September, when Helfrid and Wood, who were constables, came to his house, told him he was their prisoner, and demanded the watch: he delivered the watch, and accompanied them to Mr. Chitty's office, where he found Mr. Chitty and one Newhall. Mr. Chitty told witness he must give up the property, and said he would send him to gaol; he also asked if witness would pay the charges, to which witness replied he would pay nothing, as he had given up the watch, and lost the money for which it was pledged.

John Helfrid was produced and sworn as a witness for the defendant. He met one Newhall, a seaman, in Elliott-street, and was informed by him, that he had lost a watch, and knew where it was. Witness, being a constable, carried him to Mr. Chitty's office, where he made affidavit, that the watch was lost or stolen; upon which, Chitty granted a search-warrant, and witness went with it to Dupre's house, found the watch, and brought Dupre a prisoner to the office. Mr. Chitty and Newhall were there. Dupre said, the watch had been pledged to him for money lent, and insisted upon his right to retain it until the money was repaid. Mr. Chitty told Dupre he must give up the watch, or go to gaol; upon which Dupre gave up the watch. Newhall did not contradict Dupre. Witness received $1, for his services as constable.

***2** 2nd Specification. "A prosecution against Margaret Wyse, at the suit of Mary Douglass."

Edward Wyse, a witness for the State. About the end of August last, he returned from the North, and, the day after, was served with a warrant from Mr. Chitty's office, to give security for his wife, who was prosecuted for an assault upon Mary Douglass. He called on Mr. Chitty, and offered to give security, but was told by Mr. Chitty, that he need not trouble himself about security; for if he would pay the expenses, amounting to $4, the prosecution would be dropped. He advised witness, however, to cross-warrant Mary Douglass. Witness refused to do so, and Mr. Chitty ordered a constable to take the wife to gaol. Witness begged that the constable would remain a few minutes, and he would get freehold security: Chitty inquired "who?" witness rephed, "Mr. Hall"; and Mr. Chitty said he did not desire better. After a little time Mr. Chitty took witness aside, and told him it was quite unnecessary to give bail for his wife, for if he would only pay the expenses, to wit, $4, the business should be settled. Witness said he had not four dollars to throw away; to which Chitty replied, that the recognizance would cost a dollar and a half more. Witness said he would not pay it, and Chitty again ordered the wife to be taken to gaol. While the constable was doing so, witness followed him and desired him to stop, offering to procure bail. He then returned towards the office, and met Mr Chitty in the way, and said he would pay the dollar and a half. Mr. Chitty answered, that if he troubled him any more in the street, he would send him to gaol. Witness then went to the office of the Attorney General, who was absent; but Mr. Cruger, a gentleman in the office, gave him a note to Mr. Chitty, specifying the amount of fees to which he was intitled. Witness carried this note to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Mr. Chitty, taking Mr. Hall, whom he offered as bail, with him. After reading the note, Mr. Chitty required Hall to produce his tax receipt; on which Hall went and brought a receipt for taxes on property of the value of $1200. Mr. Chitty then filled out a recognizance for the appearance of witness' wife, which was executed by witness and Hall, and for which Mr. Chitty charged $1,25; he then gave witness an order on Mr. Hyams, the gaoler, for the liberation of his wife. Witness attended at Court, and inquired whether the prosecution had been carried on, and was informed, that the papers had not been handed in to the Attorney General. Witness called on Mr. Chitty to inquire the reason, and was told by the latter, that it was merely a recognizance to keep the peace; which witness denied, as the condition was to appear and answer for an assault. Being cross-examined, witness said, that Mr. Chitty told him there was no necessity for the prosecutrix to assent; if witness would only pay $4, the prosecution should be dropped. Witness' wife did not cross-warrant the prosecutrix.

***3** Freydeburg, a constable, was called for the defendant. Mrs. Street called witness into her house one day, and informed him there was a woman there, who wanted Mr. Chitty to take her affidavit. Witness went for Mr. Chitty, who came into Elliottstreet, and took the affidavit. This was the affidavit of Mrs. Douglass for the assault by Mrs. Wyse. Cross-examined. Mr. Chitty was in the habit of going into Elliott-street and Bedon's-alley to take affidavits.

3rd Specification. “A prosecution against Captain Cowart, at the complaint of Wyse.”

Edward Wyse, a witness for the State. Sometime about the end of August last, witness engaged to work on board the Cygnet, Cowart, master, and worked for five days; but when he asked the captain to pay him, the latter lifted his stick to strike witness, and told him if he asked for money again, he would beat him. The Cygnet was about sailing, and therefore witness went to Mr. Chitty's office to get a warrant against Captain Cowart. The warrant was granted, and soon after, witness, who had gone home, was sent for, and on returning found Captain Cowart in Mr. Chitty's office. The captain apologized to witness for the assault, and said he would pay his wages; and he accordingly gave $10, to Mr. Chitty, who returned him $1, or $2, retaining the balance for the wages, which amounted to $5, and for the expenses. Every thing being settled, Mr. Chitty proposed to treat Captain Cowart and the witness, and they all went to a shop and had some liquor. While in the shop the witness asked Mr. Chitty for his money, but he refused to pay it, unless witness would allow him to retain $2, of it. Witness refused, but Mr. Chitty insisted on keeping at least $1, and finally, gave witness $4, only.

4th Specification. “A prosecution against Caroline Saunders for an assault on Mary Anne Thompson.”And 5th. “A prosecution against Mary Anne Thompson, for an assault on Caroline Saunders.”

Mary Anne Thompson, was sworn as a witness for the State. Witness had beaten Caroline Saunders, and after two whippings Caroline got a warrant against witness for an assault and battery. Mr. Chitty came to the house of witness in Elliottstreet, she being unable to walk, bringing Wood, the constable, with him, and advised witness to cross-warrant Caroline Saunders. Witness refused to do so, without consulting her husband, and offered Mrs. Richards as her own security. Mr. Chitty said he would not take her security, unless witness would cross-warrant Caroline Saunders. Mrs. Richards then went away. One Swift afterwards offered to become bail for witness, and she went with him as well as she could to Mr. Chitty's office. Mr. Chitty said he would take none but freehold security unless witness would prosecute Caroline Saunders, and witness, to avoid going to gaol, at last consented to do so. The business was soon after settled, and William Thompson, the husband of witness, paid all the costs of both prosecutions. As witness was going home she met Caroline Saunders, who said she had not prosecuted witness with her own will. Cross-examined. Caroline Saunders never struck witness, or raised her hand against her; but Mr. Chitty, nevertheless, advised witness to cross-warrant her.

***4** Caroline Saunders, a witness for the State. Witness never prosecuted Mrs. Thompson for striking her. Mr. Chitty told her, that if she would do so, it should be all dropped. She said she had no wish to prosecute Mrs. Thompson.The prosecution was commenced without her authority. Eliza Furzman went with her to Mr. Chitty's office.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

William Thompson, a witness for the State. Went to Mr. Chitty's office to inquire about a prosecution against his wife. As he was returning home he met Helfrid, with his wife in custody, under a warrant from Mr. Mackie. They all went to Mr. Chitty's office, where Mr. Chitty advised Mrs. Thompson to cross-warrant Caroline Saunders. Witness does not recollect his wife's answer. He requested Mr. Chitty to drop it, and he did so, upon witness paying him $6.

Mary Richards, a witness for the State. Offered to be bail for Mrs. Thompson, but Mr. Chitty refused to take her, although he had often taken her security for others. Mr. Chitty advised Mrs. Thompson to cross-warrant Caroline Saunders; and witness advised her not to do so. Mrs. Thompson said at the time, that Caroline had never assaulted her.

Edward Wood, a constable, was produced as a witness for the defendant. He was in Mr. Chitty's office, when Mrs. Thompson was brought there, at the complaint of Caroline Saunders. Mr. Chitty went down to the room where Mrs. Thompson was, and witness does not know what passed there. When Mr. Chitty returned, he desired witness to bring in Mrs. Thompson. She demanded a warrant against Caroline Saunders, and it was granted. It was the custom there, when one made an affidavit of an assault, for the other party to take out a cross-warrant. Saw Mrs. Richards offer to become bail for Mrs. Thompson; but did not hear Mr. Chitty say, that he would not take her, unless Mrs Thompson cross-warranted Caroline Saunders. Cross-examined. Has heard Mr. Chitty advise people to cross-warrant each other, as it was the best way to have matters made up. It was his practice, after a cross-warrant was taken out, to make them pay the fees. Never knew him to refuse a warrant to any one. Saw Caroline Saunders make her affidavit, and heard her say she wanted a warrant.

Mrs. Furzman, a witness for defendant. Caroline Saunders asked witness to go along with her to Mr. Chitty's office to get a warrant against Mrs. Thompson for beating her. She made her complaint and affidavit. She then offered to pledge a ring or a dress for the costs. Mr. Chitty replied, that he would not take either her ring or her dress, but if she chose at any time to make him a present of any thing, it was well and good. This witness was confronted with Caroline Saunders.

Caroline Wood, a witness for defendant. Caroline Saunders lived with witness. Mrs Thompson beat her severely, and she went to Mr Chitty to get a warrant against her. Caroline Saunders told witness so.

6th Specification. "A prosecution against Mary Dowling, Mary Anne Thompson, prosecutrix."

***5** Mary Anne Thompson was produced as a witness for the State. Mary Dowling prosecuted witness for an assault and battery. She had previously assaulted witness, and was sent to gaol for want of security. Mr. Chitty advised witness to cross-warrant Mary Dowling; and by that means the business would be made up, which would be better than going into Court. Witness did prosecute, and the matter was made up. Witness paid Mr. Chitty $5, for the costs of both prosecutions.

7th Specification. "Inciting and persuading A. S. Harris, to cross-warrant A. Talvande."

A. S. Harris, a witness for the State. Witness was arrested last summer for an assault and battery on Mr. Talvande, and was committed to gaol. Mr. Chitty came to him there, and said "Harris, you had better cross-warrant Talvande."He made no reply. His mother advised him not to take out a cross-warrant. Talvande gave the first blow in the affray between him and witness. Witness had never told Mr. Chitty the merits of his case, but it was a matter of public notoriety.

8th Specification. "Inciting Wyse to persuade his wife to cross-warrant Mary Douglass."

For testimony on this specification, see that under the 2nd.

9th Specification. "State *v.* Appleton Brooks. The warrant which Mr. Chitty issued against Brooks, to answer to a complaint of Olive Poland, and the settlement of the prosecution, will be relied on as a case of barretry."

Oliver Poland, was sworn as a witness for the State. Appleton Brooks boarded with witness. He came to the house drunk, and a quarrel ensued. Brooks prosecuted witness, and when the latter went to give bail, Mr. Chitty, and Helfrid the constable, advised

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

him to cross-warrant Brooks, and as it was late he would have to go to gaol. He did so, and paid $1,50. and also 50 cents for the warrant. The next day, a bar-keeper, a neighbour, went and took Brooks out of gaol, when he went to sea. The case was never called in Court. Had no intention to cross-warrant Brooks, until Mr. Chitty persuaded him to do so. Brooks gave the first blow. Mr. Chitty never told witness he must give security to prosecute until after the warrant was issued, and it was then dark in the evening.

John Helfrid, a witness for defendant. Witness met Brooks in Elliott-street, and told him he had a right to warrant Poland. Poland afterwards told witness that he had been first assaulted and beaten; and witness then advised him to cross-warrant, and carried him to Chitty's office for that purpose.

The affidavits of Mary Douglass, Edward Wyse, Caroline Saunders, Mary Anne Thompson, and Oliver Poland, referred to above, and the several recognizances, were produced in evidence by the defendant.

The presiding Judge charged the jury, that it was immaterial, whether the suits stirred up were of a civil, or criminal character, or whether they were committed by private individuals, or by men in authority, since contests of either kind equally affected and disturbed the peace and harmony of the community; with this difference, indeed, that the offence was certainly more aggravated, when committed by a magistrate, charged with the duty of preserving the peace. That the offence was punishable by fine and imprisonment, proportioned to the degree of guilt; and, in some cases, was visited with a degradation from office. And his Honor further charged, that the stirring up of suits against the wishes of the parties injured or interested, for the sake of lucre, was barretry, even in cases, in which it would not otherwise be illegal.

***6** The jury found the defendant guilty: and a motion was now made for a new trial, on the ground of misdirection, and that the verdict was against law, and not sustained by the evidence.

W. P. Finley, and J. L. Wilson, for the motion, contended, that, conceding the position, on which the whole prosecution rested, to wit, that an indictment for barretry might be sustained against a magistrate, for exciting public prosecutions; still there was nothing whatever in the evidence, which would support the verdict which had been rendered. Barretry is "the stirring up and exciting" of suits and quarrels; and it was for that offence alone, that the defendant was indicted. Taking illegal fees, if in fact it had been done, certainly did not constitute barretry, but was punishable in another manner. And this was the only offence, which had been in any manner substantiated against the defendant. To suppress a prosecution, when it is discovered to be groundless, or, in case of an assault or battery, when the party injured is willing to suppress it, is, equally with instituting one, when there is a ground for it, the duty of a public magistrate; and it is altogether new law, that he is not intitled to demand his legal fees, from the individual by whom the groundless prosecution was instituted. In granting the search-warrant against Dupre, the defendant did no more than the law made it his duty to do. 2 Hale's P. C. 113, 114. It is true, that he erred in requiring Dupre to surrender the watch to Newhall, but it was an error, from which he was to derive no personal advantage, and one for which he is not criminally responsible. What does it amount to? Newhall was confessedly the owner of the watch, but the defendant should have left him to his action; and because he saved a law suit, by delivering the property to the real owner, he is called upon to answer as a barretor.

Admitting the defendant's conduct to have been, to the full, as reprehensible as the witnesses would have it believed to be, yet where is the evidence of barretry? There is no evidence, whatever, that the defendant incited or instigated the prosecutions against either Dupre, Mrs. Wyse, or Captain Cowart. The prosecution against Mary Douglass does not appear to have been groundless; but, in fact, no prosecution was ever commenced. The prosecution against Mrs. Thompson for an assault on Caroline Saunders, was not only well founded; but the prosecutrix is not to be believed, when she alleges, that the defendant incited that prosecution: for she is contradicted by three witnesses, and by her own affidavit, and the fact, admitted by herself, that she went, of her own accord, to the office of the defendant, for the purpose of making the affidavit. The prosecutions against Mary Dowling, Appleton Brooks, and Talvande, appear to have been, all of them, well founded; but the latter was never in fact instituted. And if a magistrate's expressing an opinion, that a prosecution ought to be commenced, will support an indictment against him for barretry,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

although his opinion was not acted upon; and particularly, where there appeared to be ground for a prosecution, it will be difficult to imagine a mode in which a Justice of the peace can discharge the duties of his office, without subjecting himself every day of his life to the penalties of this sweeping offence. But, if the most sweeping extent be given to the definition, it cannot reach the defendant. To "excite or stir up" a suit, it is certainly necessary that there should have been "a suit" stirred up; and there is no evidence bringing home to him the charge of inciting a groundless prosecution, except in the single instance of the case against Caroline Saunders for an alleged assault on Mrs. Thompson. To say nothing of the degraded and suspicious character of the testimony, by which the charge of ""exciting" is supported even in this case, it is clear, from all the authorities, that a single act of barretry will not sustain an indictment. 3 Saund. 308. Nor will even two suffice. *Vide* 8 Rep. 74, where Lord Coke lays it down, that he "ought to be *communis barrectator, scil.* not in one or two, but in *many* causes, so that he may be proved a common barretor."To the same effect are, Rolle's Abr. Barretors. Bac. Abr. Barratry. (A.) 1 Hawk. P. C. ch. 81, sec 5. Cr. Cir. Comp. 208.

***7** It will, however, be urged, and was so charged by the presiding Judge, that it is immaterial, whether the prosecutions were groundless, or well founded, if they were excited by the defendant for the sake of lucre. The admission of this doctrine would go nigh to convert every member of the legal profession, and the defendant is one, into a barretor. The taking money, or other fee, cannot render the promotion of a suit illegal, in the case of a lawyer, if the doing so, without fee, would not be illegal in another person. But to advise one who is wronged to appeal to the laws for redress, cannot be an offence in any one. It would be a perversion of all principle, a violation of every maxim of sound legislation, to make it so. What! are the doors of justice open only to the rich, and the educated? Are they to be closed to the poor, and the uninformed? Most assuredly the doctrine, that it is criminal to assist one whose legal rights have been trampled on, with advice, or even with money, ends at last, in that. Moreover, would it not be the inevitable tendency of the rule, to compel every one to advise his friends to look elsewhere than to the laws, for the redress of injuries? No authority, however, has been produced, and none cau be produced, to support such a doctrine; but on the contrary, the most conclusive authority can be adduced against it. In 1 D'Anver's Abr. 726, it is laid down not to be barretry to solicit even a groundless suit for another, *unless the party knew that the suit was groundless*. To the same effect are 3 Mod. 97. Com. Dig. Barretry. (B.) Starke's Virginia Justice, 43. And this rule, by the way, covers every one of the cases relied on for the prosecution; for in no one of them was it made to appear distinctly, that there was no ground for a prosecution, much less that the defendant knew that there was not.

An insuperable objection, however, to the verdict is, that not one of the suits alleged to have been stirred up and excited by the defendant, is a "suit" in the usual sense of the term, but each and every of them was a criminal prosecution. It is true, that the word "suit," in its more extended signification, includes a public prosecution; but it is certainly not usually so understood, and no writer would so use it, without otherwise indicating his meaning. None of the definitions of barretry contain the word prosecution, nor any other of the same import, although running otherwise into detail. Take Lord Coke, for instance. A barretor, he says, "is a common mover, and exciter, or maintainer of suits, quarrels, or parts, either in Courts, or elsewhere in the country. In Courts, as in Courts of records, or not of record, as in the county, hundred, or other inferior Court. In the country, in three manners," which he particularly specifies. Co. Lit. 368, a. b. But he neither mentions criminal Courts, nor criminal prosecutions. In "the case of barretry," 8 Rep. 72, he specifies a variety of instances of barretry, but not one of them was a criminal prosecution. One solitary instance is cited of "bringing a special *supplicavit* or *latitat* of the peace"; but it is obvious from the context, that these processes were resorted to in the case cited, as the means of enforcing a pretended civil right: and the bringing of them could no more be considered a public prosecution, than an application at this day for a *mandamus*, or *quo warranto*, to try the title to an office. This passage from Coke was, however, relied upon by the counsel for the prosecution, with great emphasis, as was also a passage from Lambard's Eirenarchia, the amount of which is, that "no mainteiners of euill nor barrettours should be assigned to keepe the peace": and this was all, which even the learned research of the Attorney General has been able to cull from the musty pages of the year-books, and the black-letter volumes of the old abridgments and reporters, down to the present times, in support of the position, that an indictment may be

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

maintained for barretry, for instituting criminal prosecutions.

***8** It would, perhaps, be sufficient to urge in reply, that all the authorities concur, that it is not barretry to maintain any number of actions of one's own, although they should all be groundless. 3 Mod. 97. &c. And that a public prosecution is every man's suit. But it is a part of the public policy to encourage public prosecutions, whenever the law has been violated, or supposed to have been violated. Hence a host of *qui tam* actions, and penalties, given to informers by statute. It is the acknowledged duty of every good citizen to bring offenders to trial; and it is emphatically so, of a justice of the peace. It is the very object of his appointment; and is it not monstrous to say, that for doing that, which the law makes it his duty to do, he is liable to be brought before the Courts of his country, to be punished as a criminal? If he should sometimes err, his situation necessarily exposes him to the commission of error, and the law should not visit its ministers with too severe an eye. Admitting that barretry may be committed by criminal prosecutions, yet assuredly a different rule must prevail in relation to magistrates and private persons; and however it may be in regard to others, a very limited number of prosecutions cannot, if any number can, subject a magistrate to the charge of barretry, whilst acting on the sessions side of his jurisdiction.

It is a question deserving of consideration, whether any indictment can be maintained against a magistrate, in his individual capacity, for acts done by him officially; but whether he ought not to be specially indicted for mal-practice in office. 1 Bl. Com. 354. note. 2 Bay, 6. Acts of 1796, and 1799, 2 Faust, 83. 261. The great and weighty objection, however, to the conviction in this case, is, that it establishes a fatal precedent, in sacrificing a public magistrate to the vindictive malignity of that very class of the community, whose outrages it was his principal business to restrain. Brought by the duties of his office into continual collision with the dissolute, the unprincipled, and the abandoned, is it to be expected that he should have acquired their good feeling by an upright performance of his duty? Is it not obvious, that, by the rigid and faithful enforcement of the laws, he must necessarily, have incurred the hatred and ill-will of these people? And is it not clear to demonstration, that precisely in proportion to the honest discharge of his public functions, must be their animosity against him? Look at the *indicia* of this prosecution. All Elliott-street and Bedon's alley have come forward to join in the hue and cry; and the sinks and stews of the city have been emptied, to bear testimony against the defendant. With one or two unimportant exceptions, the witnesses for the prosecution are persons living in habitual violation of the laws, impatient of all restraint, human, or divine, and kept within any bounds solely by the arm of the law. And it is upon evidence drawn from so foul a source, that the character of a public magistrate is to be blasted, and he himself consigned to infamy and punishment.

***9** Indictments for barretry belong to the olden time. They do not suit the altered circumstances and habits of modern society. Like the “tryal by battell,” they have become obsolete amidst the advancement of jurisprudence, before the tardy hand of the Legislature has erased them from the code. A prosecution for barretry, it is believed, is unprecedented in this State, and its punishment as an offence is known to our law, only through the medium of the act of 1712, making the whole common law of force. This has afforded a ground for turning over the mouldy volumes of antiquity, and disturbing the worm-eaten records of a barbarous age, to legislate for modern times. But it deserves consideration, and very serious consideration, whether reviving the indictment for barretry, for the purpose of making a magistrate a victim to the bad passions of those, with whom his office has brought him in conflict, is at all likely to subserve the purposes of criminal justice, to vindicate the majesty of the laws, or preserve the purity of their administration.

There is one other ground of objection to the verdict in this case, which independently of every other must be fatal. The evidence of the defendant's having exacted illegal fees, was irrelevant to the charge of barretry, and being punishable as a distinct offence was wholly inadmissible. 1 Ph. Ev. 142. If relevant, it ought to have been mentioned in the specifications. 1 Hawk. P. C. ch. 81, sec. 13. 6 Mod. 262. 3 Saund. 308 a, note. The reason of the technical rule applies with peculiar force to this case. The exacting illegal fees was the burden of most of the charges: it was in fact the *gravamen* of the whole case; and it was that which prejudiced the defendant with the jury. But it

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

was a charge which he could not be prepared to meet, for he had no notice that it would be brought against him. He has a right, therefore, to meet it now, and he is intitled to a new trial for the purpose of doing so. He asks it, not to escape a trial, but to have a fair one; that he may enjoy an opportunity of vindicating his character by testimony, and refuting the charges which have been made against him.

PETIGRU, Attorney General, *contra*.
The character of the witnesses for the prosecution, certainly stands in need of no labored vindication on this occasion. It was perfectly competent to the defendant to have impeached their credit, if he could, on the trial in the Court below; and if he omitted to do so then, it is too late for him to attempt it now. If in fact he had introduced any evidence on that topic, the verdict of the jury would be a conclusive answer to the objection. It is idle, however, to object to the habits or pursuits of the witnesses. It is upon testimony of the same description, that in nine cases out of ten, criminals are brought to conviction; because it is in presence of such witnesses that crimes are most usually perpetrated. One who goes into Elliott-street to commit an offence, must expect to be tried upon evidence from Elliott-street. If Mr. Chitty dislikes the character of those who have appeared against him; the answer is, that he was free to select his associates, and he has only himself to blame for trafficking and vending his wares to those, who would profit by his example.

***10** With regard to the number of barretrous acts necessary to a conviction, it may be conceded, that there must have been more than two, and that they must have been frequent-in short, that the defendant must have been a *common barretor*. But this admission does not affect the present conviction: nine distinct charges have been sustained by the verdict of the jury; and never was there a case in which the proof was stronger of an habitual, constant, and familiar dealing in an offence against the laws. It is supposed, that in some of the charges contained in the specifications, there was no proof of the defendant's having excited the prosecutions. It may be admitted that the proof was not direct; but may not crimes be proved by presumptions?And are they not most frequently so proved? The only wonder is, that the direct interference of Mr. Chitty should have been in so many instances brought home to him. He had his agents prowling about to start the game for him, whilst he remained in the back ground, but on the watch to pursue the victim. In every instance, the fact of his having excited the prosecution, was established either by direct evidence, or by presumptions the most conclusive and irresistible. His own witnesses unconsciously established his guilt; and if all the evidence for the prosecution were stricken out, that which was produced by himself proves, beyond controversy, that he was a *common barretor*. It was the practice of his office, says Wood, to cross-warrant in every case. Mr. Chitty always advised it, as the best way to have matters made up; and always exacted his fees when a cross-warrant was taken out. Witness never knew him refuse a warrant to any body. Freydeburg says, that Mr. Chitty was in the *habit* of going into Elliott-street and Bedon's-alley to take affidavits. Helfrid was somewhat sharper than the other two witnesses, but even *he* did, nevertheless, permit the truth to leak out. It appears from his own testimony, that he went about recommending prosecutions and cross prosecutions, whenever he heard of the semblance of a misdemeanor, in a region, where, according to the counsel for the defendant, misdemeanors were the common occurrencies of every day. And this Helfrid, it seems, was one of Mr. Chitty's constables, an agent, and hanger on of his office. Assuredly there is not wanted clearer proof, that to breed quarrels, stir up strifes, and excite prosecutions, for the sole purpose of afterwards suppressing them on the payment of fees legal, and illegal, was the business of Mr. Chitty's office, carried on upon a grand scale, and conducted by numerous agents, all of them deriving their support from the trade.

The testimony of Mrs. Furzman, also a witness for the defendant, discloses a degrading and disgusting picture of the prostitution of the dignity and character of a magistrate, which, for the honor of the country, it is to be hoped, is without a parallel. She states, that when Caroline Saunders prosecuted Mrs. Thompson, she offered to pledge a ring or a dress for the costs. And what was Mr. Chitty's reply? “He would not take either her ring, or her dress; but if she chose at any time to make him a present of any thing, it was well and good.”And yet it is contended, that the law has no penalties for an offender of this character.

***11** If the common law were indeed so defective, it would be high time for the Legislature to interpose a remedy. But this appears to be the very case, which

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

was intended to be punished under the title of barretry; and it is an objection of no force, that an indictment for that offence is not of frequent occurrence. The offence itself, it is to be hoped, is unusual; but it is a mistake to suppose that a law can ever become obsolete, whilst there exists a case to which it is applicable. The Legislature alone have authority to repeal laws, and the business of the Courts is simply to enforce them until they are repealed. And whatever repugnance might exist, in other cases, to reviving the penalties of an antiquated and forgotten statute, there can be no such feeling in reference to this case.

It is vehemently contended, however, that exciting prosecutions for criminal offences is not barretry, and particularly that a limited number of prosecutions will not render a magistrate a barretor. The office, it is conceived, can afford no immunity to the offender. A justice of the peace does not possess the privilege of perpetrating crime, unpunished. If he commits murder, or larceny, he must suffer the penalties of the law; and the rule is the same as to lesser offences. His guilt is, in fact, aggravated by the breach of official trust, and ought to meet with severer retribution. As to barretry in particular, many ancient statutes have been made, for the purpose of excluding barretors from the commission of the peace, because barretry was always regarded as an offence peculiarly hateful, and oppressive to the community, in a magistrate. Lambard's Eirenarchia, 20, 30-2. Whether exciting prosecutions is barretry, in any person, is a question which admits of little doubt, if the evils arising from the perpetration of the offence, and which, therefore, constitute its essence, are taken into consideration. It is urged, that no authority has been produced to support the indictment. But is it not a sufficient answer to say, that no authority has been produced to the contrary? It is admitted that the definition is broad enough to include the present case; and it is surely then incumbent on the defendant, to produce authority for the exception.The cases put by way of illustration, do not restrict the general terms of the definition; and if so intended, would render the definition itself worse than useless or unmeaning. But the case of a special *supplicavit*, or *latitat* of the peace, mentioned by Lord Coke, is an authority directly in point. It is supposed that this case is got over by saying, that it was resorted to, in order to enforce a particular civil right: But that is the very *gravamen* of the offence, the abusing the criminal process of the law for base and selfish ends. The passage referred to, almost seems to have been written for the case before the Court: here we have the exciting of prosecutions and cross-warrants of the peace; "and all this by fraud and malice, to enforce the poor party *ad redimendam vexationem*, to give him money, or make other composition."And, may we not add, in the language of Coke, "this is the most dangerous oppressor, for he oppresses the innocent by colour and countenance of the law, which was instituted to protect the innocent from all oppression and wrong."8 Rep. 74. As to the suggestion that a public prosecution is every man's suit, and that bringing any number of suits of one's own, is not barretry; the answer is, that a prosecution is not every man's business. The reason given in 1 Rol. Abr. 355, the authority referred to, that the party is liable for costs, does not apply, because the costs of prosecutions are never paid by the prosecutor, but by the State, unless they are obtained from the defendant. And there can be very little question, that to bring a number of suits, even of one's own, if they are merely vexations, would be barretry. 1 Hawk. P. C. ch. 81, sec. 3.

***12** The question, whether there being grounds for some of the prosecutions, makes any difference as to the defendant's guilt, is of importance in this case, only so far as the charge of the presiding Judge on that point may be supposed to have influenced the verdict. There were a sufficient number of groundless prosecutions, fully substantiated, to have sustained this indictment; and it is clear from the evidence, that Mr. Chitty himself never regarded the inquiry, whether there was a ground for prosecution, as worth a thought when a warrant was applied for. Wood, his own witness, swears that he never refused a warrant to any body. The presiding Judge, however, was correct in his charge. The authorities cited to the contrary, amount to no more than this, that suits instituted, or excited, for the *bonafide* purpose of advancing the ends of justice, are not the subjects of barretry. The definitions of this offence, make no distinction between suits and quarrels which are groundless, and those which are not. Nor is there any foundation, in the nature of things, for such a distinction. To pollute the fountains of justice, to pervert the law to the gratification of a love of mischief, or lucre, or the other basest passions of the human breast, constitute the essence of the offence; and a magistrate, who sends his agents abroad to bring in the parties to every quarrel that arises, and then persuades them to prosecute each other, in order

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to exact fees for afterwards suppressing the prosecutions, is guilty of barretry in its rankest form. He is a petty tyrant, against whom the law should award the most exemplary punishment.

It is said, that the defendant should have been specially indicted for mal-practice in office. But there is no such technical offence known to the law, as mal-practice in office. If a magistrate is guilty of a specific offence, he must be indicted for it, in the same manner as any other individual; and if he is convicted, to the other penalties is superadded that of removal from office. And this is the plain and obvious meaning of the acts of 1796, and 1799.

The last ground relied on, to wit, that the evidence of the defendant's having received illegal fees, went to charge him with a distinct indictable offence, and was, therefore, inadmissible, is equally untenable with all the others. Barretry, like every other offence, depends upon the *quo animo*, with which the the act charged was committed. To have incited legal prosecutions, was no otherwise blameable, than as it was done for base and illegal purposes. The *gravamen* of the defendant's guilt is, that he excited prosecutions, for the express purpose of exacting fees as the condition of afterwards abandoning them; and proof of his taking illegal fees for doing so, was part of the *res gestae*, and entered into the substance of the offence. It was, therefore, admissible, according to all the books; 1 Ph. Ev. 143. 1 Stark. Ev. 39: and were it otherwise, a criminal would have merely to commit two offences at the same time, and as no evidence could ever be received of either, he would escape punishment for both. The want of notice cannot be seriously urged. The defendant knew the charges he was to meet, and might have been prepared with evidence to defend them, if he had it. He has had a very full and fair trial, and has utterly failed to controvert the charges which were brought home to him; and he must make the atonement, which is due to the injured and insulted laws of his country.

JOHNSON, J. delivered the opinion of the Court.
***13** Lord Coke defines a barretor to be, "a common mover and exciter, or maintainer, of suits, quarrels, or parts, either in Courts, or elsewhere in the country. In Courts, as in Courts of record, or not of record, as in the county, hundred, or other inferior Courts. In the country, in three manners: first, in the disturbance of the peace: second, in taking and keeping possession of lands in controversy, not only by force, but also by subtilty and deceit, and most commonly by suppression of truth and right: thirdly, by false inventions, and sowing of calumniations, rumors, and reports, whereby discord and disquiet may grow between neighbours."Co. Lit. 368 a. b. And this definition is followed by all other elementary writers. Rolle's Abr. 353, Barretors. 1 D'Anver's Abr. 725, Barretors. 4 Viner's Abr. 208,-9, Barretors. A. Bac. Abr. Barratry. (A.)

The notice to the defendant, containing a specification of the matters intended to be given in evidence on the trial, was confined to acts of the defendant, tending to promote, and excite the commencement of divers prosecutions, in the Court of Sessions, for assaults and batteries, and other petty offences: and I shall, therefore, confine my remarks to that part of the general definition, which describes a barretor as a common mover and exciter of suits in Courts. And I shall consider: 1st. Whether moving and exciting criminal proecutions constitutes barretry. 2d. Whether barretry can be committed by moving and exciting the commencement of a just suit, supposing the motive to be selfish, or oppressive.

The argument in support of the negative of the first proposition, is, that the affirmative would facilitate the escape of offenders, by deterring persons from taking that interest in public prosecutions, which is indispensably necessary for bringing the violators of the law to justice; and which is not only the privilege, but the bounden duty of every good citizen, and more especially of public magistrates. The general definition is sufficiently broad to cover every description of legal proceedings. It is certain, that criminal prosecutions are not expressly excluded; and if we examine the policy, which punishes the offence, it will be found, that there is no reason, why they should be excluded. The offence, as I understand it, does not consist, as I shall hereafter have occasion more particularly to notice, in promoting either private suits or public prosecutions, when the sole object is the attainment of public justice, or private right; but on the prostitution of these remedies to mean, and selfish purposes. He who brings a public offender to justice, does well; but he who uses a public prosecution as a means of gratifying a passion for mischief, or for the sake of filthy lucre, or

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

oppression, is an offender of no ordinary magnitude. A protection is, therefore, found against the evil which the argument supposes, in the motive which prompted an interference in the prosecution, and in the further circumstance, that it does not consist of one, but of many independent acts. If it be insisted, that this would expose a party to the caprice of a jury, it is answered, that the intention enters into, and is of the very essence of all criminal offences; and when the other acts are ascertained, it is of that alone the jury are to judge: and one charged with barretry can not be more favoured.

***14** The promotion and excitement of civil suits for bad motives is, confessedly, within the scope of the definition. Is a public prosecution less liable to be abused, or less oppressive in its effects, than a civil suit? If the design be to sow the most incurable and implacable dissentions; to inflict ruin on an individual; to extort money; or gratify a restless, mischievous inclination, and triumph in the tortures which are inflicted on others, villainy itself could not have forged an engine more accessible, or more destructive in its effects. A civil suit operates only on the purse of the victim; but this is the least evil to be expected from a criminal prosecution. Lord Coke takes the same view of the subject, in his report of "The Case of Barretry," in which he enumerates among the various modes by which the offence may be committed, the "malicious bringing of a special *supplicavit*, or *latitat* of the peace, all by fraud and malice, to enforce the poor party *ad redimendam vexationem*, to give him money or make other composition. And this," he adds, "is the most dangerous oppressor, for he oppresses the innocent by colour and countenance of the law, which was instituted to protect the innocent from all oppression and wrong."8 Rep. 74.

The second proposition, although not perhaps indispensably necessary to the case, made by the facts, becomes important on account of the instruction of the presiding Judge to the jury, that the stirring up of suits against the wishes of the party injured, or interested, for the sake of lucre, would constitute barretry, even in cases which were not otherwise illegal. The books all agree in the definition before given. A common mover and exciter of suits, &c. is a barretor, without distinguishing between such suits as are just, and such as are unjust, and whether well, or ill-founded. The indictment itself contains the same generality of expression. It charges that the accused "divers quarrels, strifes, suits, and controversies, among the honest and liege subjects of our Lord the King, did then, and there, move, procure, stir up, and excite, to the evil example of all others in like cases offending," &c. Cr. Cir. Comp. 206. From all which, I think it clearly deducible, that the offence may be committed, by promoting or exciting suits, or prosecutions, although a wrong may have been done, or a petty offence committed. Independently of the generality of the definition, it is a standing rule, that the indictment must so state the facts, that the Court may see that an offence has been committed, without any reasonable intendment to the contrary. No words or periphrasis will supply the terms of art, used in the definition of an offence, as that of *felonice* in felony; and if barretry were confined to the promoting and exciting of unjust suits, the indictment must so have stated it, for otherwise it would not appear that the suits excited, or moved, were not just.

***15** The propriety and morality of promoting just suits to recover a private right, and the necessity of encouraging prosecutions for public offences of evil example, have been urged in support of the negative of this proposition. The case of the King *v.*_______, 3 Mod. 97, has been relied on, it being there said, that if a man lay out money, in behalf of another in suits at law to recover a *just* right, he is not a barretor, and that he may do this in respect of the poverty of the party. Some subsequent writers also, losing sight of the reason of the rule, have laid it down, generally, that it was not barretry to spend money in promoting the suit of another to recover a just right. Com. Dig. Barretry. (B.) But it will be remarked, that in the very same sentence, in the case referred to, it is expressly laid down, that if one lend money to promote and stir up suits, he is a barretor; distinguishing, I think, very clearly between the meritorious act of aiding the poor in the prosecution of a right, and an officious and improper intermedling for the sake of mischief, and the injury it may work, or other bad motives.

This distinction, I think, is clearly taken by Viner. He is not a barretor, it is said, who prosecutes an infinite number of his own suits, although they are unjust; for if such person shall be a barretor, then he that sues for cause may be comprehended. 4 Vin. Abr. 208. Barretors. A. Clearly indicating that he who prosecutes a number of suits, not his own, is a

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

barretor, although they are just; and I incline myself to think with Serjeant Hawkins, that there is no well founded reason, why he who prosecutes an infinite number of unjust suits of his own, should not incur the penalties of barretry, where the object is vexation and oppression. 1 Hawk. P. C. ch. 81, sec. 3. Lord Coke has applied to a barretor the cognomen of busy-body. 8 Rep. 72. According to others, he is a deceiver, a vile knave, an unthrift, a maintainer of quarrels, &c.; and the vilest of all is he, who deals in criminal process, "to enforce the poor party *ad redimendam vexationem*, to give him money, or to make other composition."So that he who promotes or excites unjusts suits, although an offender of high rank, is not exclusively so. The busy-body, the deceiver, the vile knave, or unthrift, who excites others to litigation, with an intention to vex, and oppress, and by this means to extort money, is no less an offender against public justice.

Maintenance, it seems, is a species of barretry; and champerty, and conspiracy belong to the same class of offences, and yet it never entered into the mind of any man, that he who unlawfully maintained a suit, bargained to divide the field,[FNa1] or conspired with others, was less a maintainer, champertor, or conspirator, because the cause was just, if the motive were selfish, or oppressive. Is the Judge, juror, or witness, who receives a bribe, or the seducer who tempted them, the less criminal, because, in the end, a private wrong may have been redressed, or a public offence punished? And yet, all the reasons, which tend to excuse an act of barretry, apply equally to all these cases. The temple erected and consecrated to Justice, is not, however, to be polluted with impunity, by those who would prostitute the rules regulating its police to base and unworthy purposes; although they may be associated with, and approach under the colour of right, as in the cases before alluded to. The monster compounded of fraud, and deceit, and knavery, is forbidden the sanctuary, in whatever guise he may present himself.

> FNa1.*Campum partire; unde* champerty, *i. e.* bargaining to carry on the suit of another at the champertor's expense, on the condition of dividing the land or other matter sued for, between them. 1 Russell, 271.

***16** The redress of private wrongs, and the suppression and punishment of crimes, and misdemeanors, as the means of promoting the happiness of mankind, are the leading objects of the government and laws of every well regulated society. The pursuit of right, whether public or private, can never be an offence, where justice alone is the end in view; but every perversion of the machinery of the law to other purposes, by coupling it with improper objects, is reprehensible. Hence if one lay out money in theprosecution of a suit to recover a close, of which his poor neighbor has been deprived, and without which he must lose it, he is no champertor, because right, humanity and justice, would approve it: but if he do it upon a stipulation, that he shall receive one half of the field, if it be recovered, he is, according to the legal definition of this offence, a champertor. So if one move, or excite others to bring divers civil suits, or criminal prosecutions, in the belief that the ends of justice will be promoted by it, he is not, according to my view of the subject, a barretor; but if he superadd base and unworthy motives, as when he himself is in a situation to use them as the means of gratifying his resentment, or extorting money from the parties, he is a barretor.

The facts reported in this case speak for themselves, and shew their own application to the rules before laid down. In point of number, the acts of barretry leave no doubt, that it was the trade of the office, which the defendant kept as a magistrate and that it was of every day's occurrence, to excite and promote prosecutions for petty offences, as the means of extorting money from the ignorant: and the mind turns with disgust from the depravity which suggested it.

It has been urged as a ground in support of this motion, that as the defendant used the office of magistrate to effectuate this offence, he could only be indicted as for a misdemeanor in office; and that, however, the rule might be in respect to others, exciting a limited number of prosecutions, would not be barretry in him. Our laws recognize no distinction between citizens of the State. The same number of barretrous acts, and the same circumstances, which, united, constitute barretry in a private person, will make a magistrate a barretor, with this aggravation, that he will be presumed better to have known his master's will, and ought, therefore, "to be beaten with many stripes."

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

It is further objected, that the receiving of illegal fees was punishable in a prosecution for mal-practice in office as a magistrate, and was not, therefore, admissible on the trial of this case. The general rule very clearly is, that proof of one distinct offence, cannot be given in evidence on a prosecution for another; but that rule does not obtain, when it enters into the substance of the offence charged, or constitutes a part of the *res gestae*. In the present case, the exacting of more than legal fees, as the condition of the parties compounding the prosecutions, was calculated to develope the motives which prompted the defendant to move and excite them; and all his acts connected with them were admissible as a part of the *res gestae*. The motion for a new trial must, therefore, be refused.

COLCOCK, J. concurred.
RICHARDSON, J. dissented.
***17** I dissent in this case, because: 1st. I can find no precedent of a justice of the peace being convicted of barretry for promoting prosecutions; and no express authority in support of such a conviction, especially when he promotes prosecutions which are legal and well founded. I hold him within his official privilege. 2nd. Because the adjudications do not support the general definitions of barretry, found in the books, so as to make it clear, that a man may be considered a barretor equally for exciting legal, or illegal suits, and especially prosecutions.

Motion refused.

On the defendant's being brought up for judgment, his counsel moved to postpone the sentence, or at least the commencement of his term of imprisonment, if imprisonment should form part of his sentence, in order to afford him an opportunity of applying to the Executive for a pardon.

J. L. WILSON, for the motion, insisted that the defendant was intitled to his motion, by the provisions of the Constitution. The power, conferred on the Governor, by the 7th sec. 2d art. of granting pardons in all cases, except impeachments, gave, by necessary implication, to every convicted defendant, the right of submitting his case to the consideration of the Executive: and the Courts could not, by prematurely passing sentence, lawfully deprive the defendant of the enjoyment of that right. In the case of the State *v.* Frink, 1 Bay, 168, the execution of the sentence was postponed, for the express purpose of giving time to the defendant to apply for a pardon. In this case, as it might be contended, that after sentence the defendant could not be permitted to go at large, on his recoginzance, although the enforcement of it was postponed, it would be the better course to postpone passing sentence; and there could be no doubt, but that the conviction afforded sufficient ground for the action of the Governor, without the sentence.

PETIGRU, Attorney General, *contra*, contended, that the judicia-power was altogether independent of the executive, and should be so exercised. But that, especially, no sound reason could be urged for postponement, for the purpose of inviting executive interference, when the punishment was discretionary with the Court, and would be meted out to the defendant in the exact ratio of his demerits. Nor would the postponement avail the defendant as to the imprisonment; for he is not intitled to be at large on his recognizance, after the dismissal of his motion for a new trial. And should either his sentence, or the execution of it be postponed, a motion must be made for his commitment. It may well be doubted, whether he would be bound to submit to his punishment at a future day; for there is no process to bring in a defendant to suffer corporal punishment, who has been suffered to go at large after conviction, and the dismissal of an appeal.

RICHARDSON, J. delivered the opinion of the Court.

A motion is made to postpone passing sentence in this case, or at least the actual infliction of confinement, in order that the defendant may have an opportunity of applying to the Governor for a pardon, to be pleaded in bar of the sentence, or the punishment, as the case might be: and the case of the State *v.* Frink, 1 Bay, 168, is relied upon, in which the Judge postponed the punishment of branding in the hand, until a pardon could be applied for.

***18** Wherever the law, *ex vi termini*, inflicts, upon conviction, a specific, and infamous punishment, it has been very usual for the Judge, at his discretion, to order the *punishment* to be inflicted on some day so distant, as to enable the convict to apply for a pardon in the meantime. Humanity, reason, and I may add, duty, all call for this practice; and the Judge may very properly, in such cases, postpone the punishment, exercising his own judgment as to time, and circumstances, &c. But wherever the punishment depends, as in the case now before us, upon the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

discretion of the Court, this reason for postponement no longer exists. And in all cases, a respectful spirit of comity and justice to the Executive, require that he should be informed, by the passing of the sentence, what the punishment is to be, whether light or severe, in order that he may judge rationally, and understandingly, upon the subject; and thereupon pardon, remit the sentence, or reject the application altogether. The sentence ought, therefore, to be pronounced in such cases at the accustomed time, if it were only to inform the Governor of what the punishment is to consist. In the case before us, there is little reason indeed to support this part of his motion; because the defendant has had already several months, since the conviction, to apply to the Governor for a pardon, and to arrest the sentence; and the practice of doing so, pending a motion for a new trial, is too well settled to admit a doubt of the defendant's knowing his constitutional right to have made the application for such pardon, and to have obtained it, if he could.

The second branch of the motion is, to fix a distant day for the anticipated confinement of the defendant, that he may apply for a pardon *ad interim*. It would be sufficient to answer this proposition with the reason last given, to wit, that the defendant has had time enough, if a pardon were to be procured for a full remission of the imprisonment; and if no more than a partial remission be looked for, there is, then, little reason in delaying the commencement of his term of confinement. But there is great reason in rejecting such a change in the practice; and as the point has been warmly urged, it is deemed a fit occasion to express our opinion. Such a practice would give rise to the appearance, at least, of partiality, or of the influence of defendants who have been convicted. It would be the means of postponing, accommodating, and finally of eluding, or commuting the punishment. It would look suspicious in the eyes of sagacious byestanders; and that alone is a sufficient objection for rejecting a practice so novel. For after all that can be said upon the official independence of a Judge, and his commission of *dum bene se gesserit*, next to his conscious fidelity in the discharge of his duties, the great support is the approbation of the intelligent and virtuous, who see and overlook his daily judicial acts. This is public confidence, not popularity; and is indispensable to the continuous support of the official independence upon which the purity of our judicatures rest.

***19** But apart from such general and moral considerations of the subject, there is an answer to the motion strictly legal and judicial. The moment a defendant is convicted, he is in the custody of the Court, and is to be confined, in order to be forthcoming on sentence day, whatever may be the sentence. Any other legal rule would allow a commutation of the punishment, either by the payment of his recognizance, or at most, by his own voluntary absence from the State, which would be often a grateful accommodation to convicts. Whatever practice then, humane considerations may have introduced, to delay moving the Judge to order the party convicted into the custody of the sheriff; and whatever may very possibly, in some cases, be the actual enlargement of the defendant, and which this very motion intimates; the Court must consider him as in the custody of the sheriff, and his confinement is no greater after the sentence.

Motion refused.

The motion to postpone the sentence having been refused, the defendant's counsel asked leave to submit a motion in arrest of judgment. Leave was granted accordingly; and at a subsequent day in the term, a motion in arrest was made on the following grounds: 1. That the prosecution was barred by lapse of time. 2. That the defendant should have been indicted by the title of his office. 3. That the judgment should be limited to the removal of the defendant from office.

J. L. WILSON, for the motion.

It is the settled practice of the Court of King's Bench, to refuse leave to file an information against a magistrate, after the lapse of two years. The King *v.* Harris and Peters, 13 East, 270. The King *v.* Marshall and Grantham, *Ib.* 322. See also 1 Ch. Cr. Law, 875. This practice is obviously founded in reasons of the soundest policy: for whilst magistrates should be most severely punished when guilty of deliberate violations of the law, they should be protected against vexatious prosecutions, and particularly against a prosecution, which has been delayed so long, as to put it out of the power of the magistrate to meet it as fully, as he might have done, if it had been promptly commenced. Independently of this practice, however, the St. 32 Hen. 8. c. 9, P. L. 54, limits the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

commencement of prosecutions for bracery, and other offences of the same class, to one year after the offence committed; and although barretry is not expressly mentioned, it comes within the descriptive words of the statute, and by a very fair construction, is included in the enactment of the limiting clause. For each of these reasons, it is apprehended, that the evidence at the trial ought to have been confined to acts of barretry, committed within one year, and two terms, next before the commencement of this prosecution. But it appears by the notice filed with the indictment, and which forms part of it, that several of the alleged acts of barretry were committed more than one year, or two terms, before the prosecution; and as evidence was received on all of them, and the Court cannot distinguish as to which of them the verdict was founded upon, the judgment must be arrested.

***20** The other objection is equally fatal. The defendant is indicted for acts which were done by him in his official capacity, and he ought, therefore, to have been indicted by the title of his office. Com. Dig. Indictment. (G. 1). This was peculiarly requisite in this case, because by the acts of 1796 and 1799, 2 Faust, 85, 261, he is punishable by removal from office; which punishment, in fact, supersedes the common law penalty. 2 Bur. 804, 834. The indictment does not allege the defendant to be a justice of the quorum; and yet the notice charges no other than acts done by him *colore officii*.

PETIGRU, Attorney General, *contra*.

All the grounds of this motion have been disposed of by the opinion already delivered, except that as to the limitation of the prosecution; and that should have been urged at the trial below. It does not arise out of the record, for the notice is no part of the record; and, therefore, it cannot avail by way of motion in arrest.

There is nothing, however, in the objection. The refusal of the Court of King's Bench, to grant leave to file an information, will not bar an indictment; for the Court possesses no authority to enact a statute of limitations. The St. 32 Hen. 8, is equally unavailing. In the first place, it does not extend to indictments, but is confined to informations, and *qui tam* actions. In the next place it applies only to bracery, and other offences, punishable by that very statute. Barretry is entirely a common law offence, and is neither within the letter, nor the intendment of the statute.

JOHNSON, J. delivered the opinion of the Court.

The indictment against the defendant charges him with common barretry, in the terms of the most approved precedents found in the books of practice: nor do the grounds of this motion call in question its technical accuracy, either in matter of substance, or of form. Now I take it, as universally true, that judgment will never be arrested except for matter apparent on the face of the record; and perhaps it would be sufficient to remark on the grounds of the motion, generally, that they are all founded on matters foreign to the record. But the novelty of the prosecution, and the interest which it has excited intitle it, perhaps, to more consideration.

In accordance with the practice in such cases, a notice containing a specification of the particular acts of barretry intended to be given in evidence, in support of the prosecution, was filed with the indictment; and this the counsel have assumed is part of the indictment itself, and some of the grounds of this motion are predicated on facts therein stated. It is not, however, referred to in the indictment, and ought not, therefore, to be considered part of it. From the nature of the offence, it is not susceptible of specification, and any attempt at a formal description in the indictment of the specific acts of barretry, would be destructive of the character of the offence; for it would then cease to be *common barretry*. The notice, in fact, is nothing more than a bill of particulars of the evidence, intended to be offered on the trial, and rendered necessary by the generality of the charge, as a means of guarding the defendant against surprise.

***21** From the notice it appears, that the defendant was a justice of the quorum for Charleston district: that the acts of barretry charged against him, consisted in his moving and exciting the commencement of divers prosecutions in the Court of Sessions, on informations made before, and warrants issued by him, for the purpose, and as the means of extorting money from the parties: and that some of the acts were committed more than a year, or two terms, before the commencement of this prosecution. Now the argument is, that this amounted to malfeazance in office, in which the barretry merged, and therefore the defendant could only be indicted in his official character: and it is contended that as by the common law, the Court might in its discretion, refuse

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

leave to file an information after two terms, evidence of acts before that time ought to have been rejected. It is also insisted, that an indictment for barretry is barred in one year by the St. 32. Hen. 8. c. 9.

The opinion pronounced by the Court on the motion for a new trial concludes the question as to the liability of the defendant to be indicted for barretry, although the acts charged were done *colore officii*. If in themselves barretrous, they were certainly not the less so because the defendant was a magistrate, and used his office the better to carry his purposes into execution. Barretry is a substantive and distinct offence, and in no wise necessarily connected with the office of magistrate, and is not, therefore, merged in an offence committed in that office. If a magistrate under colour of his office, were to award sentence of death, or other corporal punishment on an offender, and cause it to be carried into execution, that would certainly be mal-practice in office, but it will not be contended, that it would not also be murder, or trespass, as the case might be. This case is not, therefore, one in which the Court can exercise any discretion, in limiting either the time within which the prosecution must be commenced, or to which the evidence adduced at the trial must be confined.

The statute referred to, it may be conceded, limits the commencement of indictments, as well as informations, for bracery, champerty, maintenance, and some other offences of the same class, to one year after the offence is committed. But barretry is not mentioned in it, and that would be a sufficient reason for not applying it here. It is, moreover, very apparent, that it was never intended to be applied to this offence. Bracery and the other offences mentioned, consist of a single act, and the point of time is indivisible. Not so of barretry: that is made up of many acts, committed at different times, and in tracing the circumstances, it would be impossible to fix upon the precise time when it began, or when it was consummated; and it would be difficult therefore, to bring a statutory law to operate upon it. Suppose it limited to the year: one might then with impunity commit one or two acts of barretry every year throughout a long life. It is the aggregate of all the barretrous acts which constitute barretry; and the longer the list, and the more extended in point of time, the more aggravated is the offence. It is the conduct of a man through life, from which his character is drawn; and it is the habit of intermeddling, which stamps on him the character of barretor.

***22** These remarks were not, for the reasons before given, thought necessary to this as a motion in arrest of judgment; but if there had been any thing in them to warrant it, the Court might even now have given the defendant the benefit of them in the form of a new trial, and for that reason they have been noticed. The course which this case has taken has suggested to the Court, however, the necessity of remarking, that they have been led involuntarily into a violation of the practice of the Court, in hearing a case in detached parts; for this is the third occasion on which this case has been brought before us, in as many different shapes, when the whole might as well have been presented and discussed in the first instance. It must not, therefore, be taken as a precedent in future cases.

Motion refused.

On the conviction of the defendant in the Court of Sessions, a rule had been taken out against him, returnable to the Court of Appeals, requiring him to shew cause, why his name should not be stricken from the roll of attorneys and solicitors. After the motion in arrest of judgment had been dismissed, this rule was called up, and, on motion of the Attorney General, made absolute; and the defendant declared incapable of practising as an attorney or solicitor in the Courts of Law and Equity of this State.

The judgment on the indictment was, that the defendant be imprisoned for two months, and pay a fine of two hundred dollars to the State.

S.C.App. 1830.
State v. Chitty
1 Bail. 379, 17 S.C.L. 379, 1830 WL 1234 (S.C.App.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.