UNITED STATES DISTRICT COURT

DISTRICT OF RHODE ISLAND

CERTIFIED TRANSCRIPT

---------------------------

| | |
|---|---|
| PROGRESSIVE GAMING INTERNATIONAL CORP., Plaintiff, | ) |
| vs. | ) C.A. No. 08-013/S |
| GREG VENTURI and JOHN FERL, Defendants. | ) |

---------------------------

Deposition of JOHN FERL, taken at 300 South Grand Avenue, Los Angeles, California, commencing at 1:13 p.m., Tuesday, July 15, 2008, before Tarronica Washington, CSR No. 12759.

PAGES 1 - 78

Hasbro?
A No.
Q Since you were last deposed in the Hasbro versus Mikohn matter do you know if Mr. Venturi has had any communications with Hasbro?
A I have no idea.
Q You have received a payment from Hasbro; right?
A Yes.
Q How did you receive that payment?
A From Mr. Venturi.
Q What did Mr. Venturi say?
A In reference to what?
Q The payment.
A Only that he had received it.
Q Did Mr. Venturi then send you a check?
A Yes, he did.
Q Net of his fees?
A I think that is privileged.
Q So you are refusing to answer?
A I am.
Q Are you expecting further payment from Hasbro?
A Yes.
Q How much?
A I don't know. They have a couple of options concerning payment. I am not sure whether they will pay

Q Did you ever attempt to sell information to Hasbro that would lead to litigation by Hasbro against anyone other than Mikohn or Progressive Gaming?
A No.
Q Mr. Ferl, did you complete high school?
A Yes.
Q Did you obtain a college degree?
A Pardon me.
Q Did you obtain a college degree?
A Yes.
Q Bachelors?
A Yes.
Q From where?
A We are not going there. I told you anything personal and relating to financial or assets I am going to refuse to answer. I think this is malicious prosecutions, and I am not going to continue to give Mikohn, PGIC, any information about me that is going to come back to haunt me.
Q Did you review any documents to prepare for this deposition today?
A I read my earlier deposition two years ago.
Q Do anything else?
A That was it, I think.
Q Did you speak with anyone to prepare for this

Gaming International Corporation whether the documents were confidential?

A No.

Q Why not?

A If in fact Mikohn was involved in an illegal operation, why would I go to them and ask them about the veracity of the document.

Q You believe that Mikohn was involved in an illegal operation with respect to Hasbro?

A I do.

Q That's what you told Hasbro?

A I didn't tell Hasbro that. I let Hasbro come to their own conclusions. I offered nothing other than an opinion about what others had told me.

Q What was your opinion?

A My opinion was that I repeated to them that as a result of conversations with Ruhe and Van Hook, that Mikohn was defrauding Hasbro.

Q You testified earlier that you have received a payment from Hasbro pursuant to the finder's fee agreement of approximately $40,000; correct?

A How much?

Q Of approximately $40,000; correct?

A I am not going to discuss the recovery from Hasbro.

Q What did you do with the money?
A I am not going to answer that.
Q In your last deposition you testified about a telephone conversation or perhaps a series of telephone conversations between you, Mr. Venturi, and Mr. Kelly at Hasbro. Do you recall those discussions?
A Somewhat.
Q Did you tell them -- excuse me, did you tell Mr. Kelly that the Yahtzee or Battleship contracts were profitable to Mikohn worth between 4.5 to $5 million?
A I don't recall.
Q Did you tell him that the decision to adopt the royalty calculation method that it did was made by Mikohn during a quote, tough period, closed quote?
A I could have used that expression.
Q Did you tell Hasbro that its auditors that were at Mikohn, quote, didn't find anything, closed quote?
A I think I did.
Q Did you tell Mr. Kelly at that time that Mikohn may be coming under fire from regulators?
A I don't remember that specifically, but I might have.
Q Did you tell Mr. Kelly that regulators pulled the sheriff's cards for certain officers of Mikohn?
A Would you repeat that?

Q What other information did you obtain from the Internet that you provided to Hasbro?

A That's all I can think of.

Q Did you tell Mr. Kelly that Mikohn had a bond payment of $4.5 million due in November 2004 and that Mikohn might not have the cash?

A Very possibly. I remember the incident.

Q Who gave you that information?

A Again I -- it may have been Van Hook or Ruhe. I am not sure. It may have been something on the website. I don't recall.

Q Did you tell Mr. Kelly specifically to present Hasbro's claim to Mr. Dreitzer?

A No.

Q Did you tell Mr. Kelly that Mikohn most likely would seek early settlement and not contest Hasbro's claim?

A No.

Q Did you have a further discussion with Mr. Kelly on February 11, 2005?

A I don't remember.

Q The number (702) 493-1516, is that your cell phone number?

A I am not going to answer that.

Q I am looking at notes -- handwritten notes by

Mr. Kelly at Hasbro. The word "sell" appears followed by the number (702) 493-1516. Is that information you gave to Mr. Kelly?

A I am not going to respond to it.

MR. VENTURI: Is what information? You are looking at handwritten notes, and you are asking him -- I think it's only fair to give the witness the notes so he can know what you are talking about.

It just doesn't make any sense for you to ask him about something that you haven't even referred to.

BY MR. MAGRATTEN:

Q Did you tell Mr. Kelly that the state of Michigan was conducting an investigation of Mikohn?

A I don't recall.

Q Did you have any discussions with Mr. Kelly about investigations by any gaming authority of Mikohn?

A I don't recall that either.

Q I am going to ask you to turn to Exhibit R in your packet.

(Whereupon Exhibit R was marked for identification by the Certified Shorthand Reporter, a copy of which is attached hereto.)

THE WITNESS: Okay.

BY MR. MAGRATTEN:

Q Exhibit R is your -- excuse me, Exhibit R

A I don't recall any conversation about documents.
Q Did Mr. White ask you for any information about Mikohn?
A I don't recall a specific. I would say, yes, but I don't recall a specific question, time, place, or conversation.
Q Was Mr. Venturi present for that meeting?
A No.
Q Was anyone else present at that meeting?
A No.
Q Turning please to your answer to Interrogatory No. 13. You have some handwriting here. Some of it is crossed off. I am going to ask you what this means.
The interrogatory asked "Identify all conversations regarding the licensing agreements that you had with Lawrence Ruhe, Dennis Van Hook, John Garner, Tom Haas, or any other Mikohn employee, and you've written none above Garner, Haas, and other Mikohn employees; correct?
A What is your question?
Q Is that correct?
A Yes.
Q But you acknowledge you did have conversations with Ruhe and Van Hook; correct?

A Correct.
Q Are you going to supply an answer to that interrogatory?
A I thought that was answered. I did have conversations.
Q There are subparts here that ask for the substance of the conversations, the manner in which such conversations were made, the dates of the conversations, and so forth.
A The answer would be, no, I am not going to respond to it.
Q All right.
MR. VENTURI: The response is "Oral. I don't recall," on "B" and "C," isn't it? It seems to be crossed off.
MR. MAGRATTEN: Let's call this "V" and this "W." These are the motions to dismiss filed by Mr. Venturi and Mr. Ferl in the case.
(Whereupon Exhibit V and W were marked for identification by the Certified Shorthand Reporter, a copy of which is attached hereto.)
BY MR. MAGRATTEN:
Q Mr. Ferl, again, please look at those two documents marked "V" and "W."
MR. VENTURI: Can I see the documents also?

# CERTIFICATE

# OF

# CERTIFIED SHORTHAND REPORTER

The undersigned Certified Shorthand Reporter and deposition officer of the State of California does hereby certify:

That the foregoing Deposition was taken before me at the time and place therein set forth, at which time the Witness was duly sworn by me:

That the testimony of the Witness and all objections made at the time of the Deposition were recorded Stenographically by me and was thereafter transcribed, said transcript being a true and correct copy of the proceedings thereof.

In witness whereof, I have subscribed my name this date:

Tarronica Washington, CSR No. 12759